FILED
2023 Nov-07  PM 08:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF ALABAMA

3

4     SHARON DORSEY,                    )
                                        )
5              Plaintiff,               )
                                        )
6              vs.                      )  Case No.
                                        )  2:22-cv-01489-ACA
7     TRANS UNION, LLC., and I.C.       )
      SYSTEM, INC.,                     )
8                                       )
               Defendants.              )
9

      _____

10

11           ZOOM DEPOSITION OF:  SHARON DORSEY

12    _____

13

14             S T I P U L A T I O N

15

16        IT IS STIPULATED AND AGREED by and between the

17    parties through their respective counsel that the

18    deposition of SHARON DORSEY may be taken on May 11,

19    2023, before Anne E. Miller, Commissioner and Notary

20    Public, via Zoom.

21        IT IS FURTHER STIPULATED AND AGREED that it

22    shall not be necessary for any objections to be made by

23    counsel to any questions except as to form or leading

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 1**

Page 2

1  questions, and that counsel for the parties may make
2  objections and assign grounds at the time of trial or
3  at the time said deposition is offered in evidence or
4  prior thereto.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1          A P P E A R A N C E S
2
3  Appearing For The Plaintiff:
4     COCHRUN & SEALS, LLC
       Mr. W. Whitney Seals
5     300 Richard Arrington Jr Blvd North
       Birmingham, Alabama 35203
6
7  Appearing For The Defendant:
8     GOLDEN, SCAZ, GAGAIN PLLC
       Mr. Dale T. Golden
9     1135 Marbella Plaza Drive
       Tampa, Florida 33619
10
11
12  Court Reporter:  Anne E. Miller
13
        I N D E X
14
    Examination by Mr. Golden ................... 4
15  Examination by Mr. Seals .................... 63
16
    DEFENDANT'S EXHIBIT
17
    Exhibit 1 ...................... 31
18    (Collection notice -- attached)
    Exhibit 2 ...................... 49
19    (Letter -- attached)
    Exhibit 3 ...................... 37
20    (Settlement offer -- attached)
    Exhibit 4 ...................... 22
21    (AT&T Letter -- attached)
22
23

Page 4

1      I, Anne E. Miller, a Court Reporter of the State
2  of Alabama, acting as Commissioner, certify that on
3  this date there came before me via Zoom on May 11,
4  2023, beginning at or about 9:00 a.m., SHARON DORSEY,
5  witness in the above cause, for oral examination,
6  whereupon the following proceedings were had:
7
8          SHARON DORSEY,
9  having been first duly sworn, was examined and
10  testified as follows:
11
12      THE REPORTER:  Usual stipulations?
13          MR. SEALS:  We do reserve the right to read
14  and sign, if you don't mind.  If you will send that to
15  me, I will get it to her and then get it to you as
16  quick as I can.  Otherwise, usual stipulations are just
17  fine.
18
19  EXAMINATION BY MR. GOLDEN:
20    Q.  Good morning, ma'am.  My name is Dale Golden.  I
21  represent I. C. System in a lawsuit that you have
22  filed, and we are here today to take your deposition.
23  Could you please state your name for the record?

Page 5

1    A.  Yes, sir.  Sharon Dorsey.
2    Q.  Ms. Dorsey, have you ever had your deposition
3  taken?
4    A.  Yes, I have.
5    Q.  How many times?
6    A.  Once.
7    Q.  And what was that in relation to?
8    A.  Well, twice.  When my husband -- when my husband
9  passed away, I had to do a deposition for an insurance
10  company.  And then I had a dog bite that they did a
11  deposition for that.
12    Q.  All right.
13    A.  That was several years ago.
14    Q.  So you understand that -- anyway, at least
15  generally that's what's going to happen today.  I'm
16  just going to ask you a number of questions, and the
17  court reporter is going to take down everything that is
18  said.  So please just try to make sure that I'm
19  finished asking my question before you start to answer.
20    A.  Yes.
21    Q.  And I will do the same with you so that we can
22  make the court reporter's job as easy as possible.
23  Okay?

2 (Pages 2 - 5)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 6

1    A.  Okay.
2    Q.  What did you do to prepare for your deposition
3  today, ma'am?
4    A.  I read over some documents that I had recently
5  received and just -- I'm very familiar with my case.
6  It's been going on long enough that I didn't have to do
7  much preparation.
8    Q.  What documents did you review?
9    A.  Some answers on the I. C. Systems, questions
10  from my attorney.  I looked at those.  Just all the
11  documents that I have, all the letters that we sent out
12  and that kind of thing.
13    Q.  Did you listen to any call recordings?
14    A.  Call recordings?
15    Q.  Yes.
16    A.  No, not to prepare for the case.  No.
17    Q.  Have you ever heard call recordings in this
18  case?
19    A.  Yes, I have.
20    Q.  How long ago was that?
21    A.  A few weeks ago.
22    Q.  The call recordings, were they conversations
23  between you and employees of I. C. System?

Page 7

1    A.  Yes.
2    Q.  Do you remember having those conversations
3  before listening to the recordings?
4    A.  I did.
5    Q.  Where do you reside, ma'am?
6    A.  Where do I reside?
7    Q.  Yes.
8    A.  Do you want the address?
9    Q.  Yes, please.
10    A.  ████████████ in Blount County.  I receive
11  mail at my local post office, which is Locust Fork.
12    Q.  How long have you lived at that address?
13    A.  Five years.
14    Q.  Where did you live before then?
15    A.  ████████████, and then I lived with
16  my daughter for four years before I moved to this
17  current address.
18    Q.  Where is that ████████████ address, what
19  town?
20    A.  What town?  Remlap.
21    Q.  Is there anyone who lives with you right now?
22    A.  No.
23    Q.  Was there anyone that lived with you at the

Page 8

1  time, let's say, back in 2021?
2    A.  No, sir.
3    Q.  How many different telephone numbers do you
4  have?
5    A.  Two.
6    Q.  And what are those two telephone numbers?  I
7  promise I won't file them with the court.
8    A.  ████ -- I don't use this one, but I hope I'm
9  correct.  ████████  And then ████████.  That's
10  the number I use most frequently.
11    Q.  Is the ████ number a cell phone number or a land
12  line?
13    A.  It's not a land line or a cell number.  It's a
14  satellite phone.
15    Q.  Are you a secret agent?
16    A.  No.  No, sir.
17    Q.  You have a satellite phone.  That's a new one
18  for me.
19    A.  Well, the land lines weren't available at the
20  time I applied for my telephone service at my residence
21  where I currently live.  So I was referred to Via Sat
22  Satellite for a home phone and internet.
23    Q.  Who is that provider?

Page 9

1    A.  Via Sat, V-i-a, S-a-t, Satellite Systems.
2    Q.  So do you have a satellite dish on your house?
3    A.  I do.
4    Q.  Me too.
5    A.  If it rains, we have no service.
6    Q.  Yeah.  That's very true.  Very true.  I can
7  always tell when it's about to rain at my house because
8  it starts flashing.  How long have you had that cell
9  phone number?  That's the 1146 number.
10    A.  It's the only cell phone I have ever had.  So I
11  had a bag phone first, and that was the number.  And
12  then I have had this number, I would say, 25 years, 30
13  maybe.
14    Q.  I feel like the two attorneys in the room there
15  aren't old enough like you and me to remember what a
16  bag phone is.
17    MR. SEALS:  I had a bag phone, yes, I did.
18  And a flip phone.
19    MR. GOLDEN:  I couldn't afford a bag phone
20  when they were available.  I didn't get a cell phone
21  until after I got out of law school.
22    MR. SEALS:  There you go.
23    Q.  (BY MR. GOLDEN)  What is your educational

3 (Pages 6 - 9)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 10

1 background?
2    A. I graduated from high school in 1967. I
3 graduated from Birmingham School of Practical Nursing
4 in 1970. And that's -- that's basically it, other than
5 CEU's and that kind of thing that's required of me.
6    Q. So what degree did you get from Birmingham?
7    A. Licensed practical nurse.
8    Q. Where do you work now?
9    A. I'm 70 -- I will be 74 in July, and I work two
10 days a week for Dollar General in my community.
11    Q. How long have you been working with Dollar
12 General?
13    A. Since February.
14    Q. And I want the record to reflect I did not ask
15 you how old you were, okay?
16    A. Okay.
17       MR. SEALS: Noted.
18    Q. (BY MR. GOLDEN) My assumption is that at some
19 point you put that LPN to use and went into the
20 healthcare industry; is that right?
21    A. That's correct.
22    Q. How long did you work in the healthcare
23 industry?

Page 11

1    A. Ten years.
2    Q. Was that right after you got that degree?
3    A. Yes.
4    Q. And what did you do after you started working in
5 the healthcare industry?
6    A. I went to work for an insurance company.
7    Q. Which insurance company?
8    A. Liberty -- I'm sorry -- Mutual Savings for ten
9 years.
10    Q. And what did you do for that insurance company?
11    A. I worked a debit. I was a debit agent, a home
12 debit agent.
13    Q. What does that mean?
14    A. That means that I serviced the policies that
15 were on the books when I started. I wrote new
16 insurance, and I collected monthly premiums from door
17 to door.
18    Q. So I was going to ask that. So you went out?
19    A. Yes.
20    Q. How long did you work for that insurance
21 company?
22    A. Ten years.
23    Q. And then what did you do after that?

Page 12

1    A. I was sick for five years. And then after my
2 illness, after I got better, I went to work for
3 Allstate Insurance.
4    Q. What did you do for Allstate?
5    A. The first ten years, I was a QBP contractor,
6 home repairs from storms, fires, that kind of thing.
7 And then they hired me full time as a property field
8 inspector.
9    Q. Were you adjusting claims?
10    A. At times, yes. I had to be my own adjuster on
11 many of the claims that I serviced and worked. But I
12 actually estimated property values the last 16 years.
13    Q. How long did you work for Allstate?
14    A. A total of about 25 years.
15    Q. Were you involved with dealing with customers
16 then on a regular basis, insureds?
17    A. Yes, sir.
18    Q. Did you work after you left Allstate?
19    A. I did. I worked as a licensed practical nurse
20 again at Oneonta City Schools for three years, three
21 terms. And then I worked through St. Vincent's
22 Hospital. St. Vincent's lost the contract so there was
23 no job for me. And before I got home on the same day,

Page 13

1 I was called by Blount County Board of Education, and I
2 worked at Hayden Elementary School for two terms.
3    Q. And was that in the capacity of a nurse?
4    A. School nurse, correct.
5    Q. That was for about a total of about six years,
6 if my math is good?
7    A. Five.
8    Q. Five. What did you do after Hayden Elementary?
9    A. I moved to the residence where I am now, next
10 door to my friend of 47 years who was diagnosed with
11 Parkinson's Disease. And I took care of her until she
12 passed in January of '22.
13    Q. Now how would you describe the area where you
14 live now? Is it rural?
15    A. Rural, yes, sir.
16    Q. And give me an example. How close is your
17 closest neighbor?
18    A. Within sight of my home because I put it right
19 next to my friend that was sick. So I have neighbors
20 that I can see across the street and one on the left of
21 me, but that's the only ones that I can see from my
22 house.
23    Q. Both my parents grew up on farms in Wisconsin.

4 (Pages 10 - 13)

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

Page 14

1 So, yeah, that was an interesting thing to go to the
2 farm because there was a lot of space. And that's one
3 of the things that I really liked about going to the
4 farm.
5    A. That's what I like where I live, a lot of space.
6    Q. A lot of space. So do you think you have any
7 problems with your memory?
8    A. No, sir.
9    Q. You haven't been diagnosed with any sort of
10 memory issues or anything like that?
11    A. No, sir. They said I scored an A plus on each
12 one of my Medicare checkups.
13    Q. Now as I said at the beginning of this, my
14 client's name is I. C. System. Do you remember -- do
15 you know who that company is?
16    A. Yes, sir.
17    Q. And how do you know that company?
18    A. I got very familiar with them in the last couple
19 of years because they called me. I got letters from
20 them saying that they were trying to collect a debt.
21    Q. Is it your understanding that I. C. System is a
22 bill collector?
23    A. Yes.

Page 15

1    Q. Now other than I. C. System, have you been
2 contacted by any other bill collectors in your life?
3    A. Just one prior to I. C. System for the same
4 thing, for AT&T. And I wrote them a letter of dispute,
5 and they wiped it off. Then the next thing I know, I'm
6 getting letters from another collection agency for the
7 same debt that I did not owe.
8    Q. So prior to I. C. System contacting you about
9 this AT&T debt, there was another collection agency?
10    A. Yes, for AT&T, trying to collect the same debt.
11    Q. Do you remember the name of that agency?
12    A. No, sir. I got one letter from them, and I
13 wrote a letter of dispute back. And I never heard from
14 them again.
15    Q. How long after you sent that letter to the first
16 collector did you hear from I. C. System? Do you know?
17    A. Not sure about the exact time, but it was just a
18 few months.
19    Q. Did you receive letters from I. C. System? Do
20 you recall that?
21    A. I did.
22    Q. Now do you recall generally when that was when
23 you got the first letter?

Page 16

1    A. No, sir. I returned the letter that they sent
2 me with my dispute attached to that letter, telling
3 them that it was a debt I did not owe. But I don't
4 remember the exact time frame.
5    Q. Now what was the account that I. C. System was
6 attempting to collect from you?
7    A. It was for AT&T, and I had contracted with AT&T
8 to have a package deal. And they called it a U-Verse
9 account where they would put my home phone, my internet
10 and DirecTV. It was a bundled account. And that was,
11 I think, on the 18th when I contracted with them. A
12 few days after that, prior to -- just a couple of days
13 before the installation date, AT&T called me and said
14 they are so sorry, but the U-Verse account was not
15 available in my rural area. So they referred me out to
16 Via Sat Satellite for my internet and my home phone,
17 and then I did sign up with DirecTV because that was
18 available there.
19    Q. So the AT&T U-Verse service, that wasn't going
20 to be a satellite service?
21    A. No, sir. It was supposed to be a U-Verse
22 bundled package of some sort.
23    Q. Was it supposed to be cable or was it some sort

Page 17

1 of -- do you know?
2    A. I'm not sure. No, sir.
3    Q. Fair enough. I'm not sure either. So if I
4 understand correctly, it's your testimony that the AT&T
5 U-Verse service was never actually even installed at
6 your house; is that right?
7    A. No, sir. It was not available there so it would
8 have been impossible to get it.
9    Q. Now how did you find this AT&T U-Verse service?
10    A. When I lived with my daughter, she had U-Verse,
11 and it was just a couple of miles from where I moved.
12 So when I was moving into my new house, I called AT&T,
13 and they said, "Oh, yes. We have a package that we can
14 write you for a new customer." And it was to be 101 a
15 month for all three services; the home phone, the
16 internet and the DirecTV.
17    Q. I think you might have answered this, but I want
18 to make sure. So what do you have now in terms of
19 internet, TV and phone?
20    A. I have DirecTV.
21    Q. Okay.
22    A. And I have Via Sat Satellite for the other two.
23    Q. Now I remember.

5 (Pages 14 - 17)

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

Page 18

1    A.  That's okay.
2    Q.  So did you receive an actual bill from AT&T
3  then?
4    A.  Yes, sir.  For the first month, I received a
5  bill for the 101.  I think it was 101.33.  And so I
6  called them immediately and told them that I didn't
7  receive the service and that I didn't owe for that
8  service.  And they always said, "Oh, we are so sorry.
9  We will take care of that."
10    Q.  Was it just one bill that you received?
11    A.  No, sir.  I received bills from AT&T through
12  November of 2018.
13    Q.  So if I understand correctly, you got the first
14  bill.  You called them.  They said, "Oops, sorry.  We
15  didn't mean to send you that" or something like that.
16  And you were like that's good, and then they sent you
17  another bill and another bill.  How many bills do you
18  think you got from AT&T?
19    A.  I got them monthly from the first one that I got
20  in June, July, August, September, October.  And the
21  last one was a letter telling me if I did not pay that
22  I would be turned over to a collection agency, and we
23  sent you a copy of that letter.

Page 19

1    Q.  How many conversations did you have with someone
2  from AT&T directly?
3    A.  Every month.  And then for months after I got
4  the letter that says they were going to turn me over to
5  a collection agency, I called them frequently to make
6  sure that they did not do that because I was trying to
7  rebuild my credit after my husband's death.
8    Q.  And was the -- were the substances of those
9  conversations pretty much the same each time you
10  called?
11    A.  Yes, sir.
12    Q.  And that was what?
13    A.  That you weren't able to provide the service to
14  me so how can I owe you this 101.33.  I'm not going to
15  pay it because I didn't receive the service.  That was
16  essentially the conversation each time I called them.
17    Q.  And what was the response from AT&T?
18    A.  They would update my files each time.
19    Q.  Did AT&T indicate -- I mean, I know that you had
20  indicated earlier that during the initial conversation
21  when you got that bill in June, I think you said, June
22  '18?
23    A.  Yes, sir.

Page 20

1    Q.  You called immediately, and the person
2  apologized.  And I assume you took that to mean, well,
3  okay, this means they recognize their mistake and they
4  are not going to bill me for this, right?
5    A.  Yes, sir.  That's what I thought.
6    Q.  And then they sent you another bill the next
7  month?
8    A.  Yes.
9    Q.  And if I understand correctly, you called again?
10    A.  Each time I got a bill, I called them.  And
11  sometimes I was on the phone for two hours, trying to
12  -- sometimes you got someone that didn't speak English
13  and could not really help you because you don't know
14  what they are saying.  So sometimes I had to call four
15  or five times in the same day before I could get
16  someone that I could relate with because of the
17  language barrier.
18    Q.  And in any of those conversations after that
19  initial one, did you come away from the conversation
20  thinking, "Well, now this is resolved"?
21    A.  Yes, sir.  Probably each time I talked to AT&T,
22  I thought, "Okay.  This is the last time I will have to
23  be on the phone for two hours trying to resolve this."

Page 21

1    Q.  And then the next month the bill would come.
2  That happened all the way to November, when you got the
3  letter talking about how they were going to refer it to
4  collections, right?
5    A.  Yes, sir.
6    Q.  And you called AT&T after getting that letter
7  too?
8    A.  Yes, sir, I did.  I made some notes on the one
9  we sent you on that letter when I talked to two people,
10  I think.
11    Q.  This is where it's going to get tricky for me.
12  I'm going to try to share my screen.  I'm trying to
13  figure out what I did with that -- just give me --
14       MR. SEALS:  Do you have a copy of that
15  letter?
16    Q.  (BY MR. GOLDEN)  So do you see my -- do you see?
17    A.  Yes, sir.  I do see it.
18    Q.  Okay.  Good.  I have accomplished something
19  already this morning.
20       MR. SEALS:  Mr. Golden, she has her
21  original in her hand too so she can go along with you.
22    Q.  (BY MR. GOLDEN)  So if I understand correctly,
23  this is the last bill that you got from AT&T; is that

6 (Pages 18 - 21)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 22

1  right?
2    A.  Yes, sir.
3    Q.  On this account, okay.  And this is the one that
4  -- let me see here.  It says -- all right.  And it says
5  if you look at one, two, three, fourth paragraph,
6  reading this, it says, "If you do not pay the total
7  balance by the due-by date, your account may be
8  referred to an outside collection agency"?
9    A.  Yes, sir.
10    Q.  And it says, "The outside collection agency may
11  report your debt to credit bureaus which may affect
12  your credit standing," right?
13    A.  Yes.
14    Q.  And just to state the obvious, the handwriting
15  on here, on this -- we are going to call this Exhibit 4
16  actually because I have three other ones that I already
17  labeled.  So this is your handwriting, right?
18    A.  Yes, sir.
19    Q.  Okay.  And so at the top there, there is a date
20  of 11/27/18.  What is that?
21    A.  That was the date of my conversation with them.
22    Q.  All right.  And what is the handwriting that
23  precedes that date and Angela?

Page 23

1    A.  Angel, that was -- that was the name of the
2  person that I was speaking to with that conversation.
3    Q.  Okay.  And so then below that, it indicates -- I
4  think that's Monique, right?
5    A.  Yes, sir.
6    Q.  Do you remember having a conversation with
7  Angel?
8    A.  Yes, sir.  And she referred me to someone else
9  that would help me with that, getting that cleared up,
10  which was Monique.  We were making calls on the same
11  day.
12    Q.  So I want to make sure I understand.  Did Angel
13  transfer your call to Monique?
14    A.  Yes, sir, I believe so.
15    Q.  After you waited for an hour or so?
16    A.  Yes, sir.
17    Q.  All right.  And so you spoke with Monique, and
18  then there are notes that you wrote underneath that,
19  correct?
20    A.  Yes.
21    Q.  On Exhibit 4 here?
22    A.  Yes, sir.
23    Q.  Okay.  And so if you could read me what your

Page 24

1  note is there.
2    A.  When I spoke with Monique and I went over all
3  that with her, she said that I owe it and I have to pay
4  it.  So I couldn't make her understand I did not get
5  this service.  So sick of this.
6    Q.  So you spoke with Monique from AT&T on November
7  27th of 2018.  You explained the same story.  I don't
8  want to characterize it that way, but you told her what
9  had happened.  Did you tell her that you had spoken
10  with other representatives of AT&T?
11    A.  Yes, sir.  And she -- I asked her to look at
12  their notes because each time that I spoke with them, I
13  asked them to make notes about my account because I did
14  not receive the service.  And it was a billing error,
15  and she -- I can't remember if she said she sees the
16  note.  Sometimes they did tell me they see the note and
17  they are sorry it hasn't been resolved.  But on this
18  particular day, she told me that I owed that and that I
19  have to pay it.
20    Q.  Now that conversation was in November of 2018.
21  So it's what?  Four and a half years.  Do you remember
22  that really well today?
23    A.  The conversation?

Page 25

1    Q.  Yeah.
2    A.  Pretty much.  She -- I think that Monique may
3  have been somebody in billing or a supervisor or
4  someone.  And when she read -- I asked her to read all
5  the notes, and she said that I would owe that, that I
6  did owe that, and I would need to pay it.  That I would
7  have to pay it or it would be turned over to a
8  collection company for them.
9    Q.  If I understand correctly, every conversation
10  you had with AT&T before that, they were apologetic,
11  right?
12    A.  Yes, sir.
13    Q.  And then this time, it was you owe the money,
14  right?
15    A.  Yes, sir.
16    Q.  And so that was -- was that surprising to you?
17    A.  Yes, sir.  I tried to explain to her that the
18  other people were supposed to update my record.  And
19  she said that she did see some notes, but there was no
20  reason for her to tell me that I didn't owe it because
21  it was on there that I did owe it.  So that was the end
22  of that, and I didn't get another bill after this bill.
23  I don't believe I got another one.

7 (Pages 22 - 25)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 26

1   Q. And so that conversation with Monique would have
2   been the last conversation you had with someone from
3   AT&T regarding this account?
4   A. No, sir. I called after that just to make sure
5   and even pleaded with someone not to turn me over to a
6   collection agency because I was trying to rebuild my
7   credit after my husband's death.
8   Q. So if I understand correctly, you had this
9   conversation from Monique. And I assume when that
10  conversation ended, you were concerned, right?
11  A. I was upset. I was mad.
12  Q. Right. Because now AT&T was taking the position
13  you did owe the debt, right?
14  A. Yes, sir.
15  Q. And so if I understand correctly, you then at
16  some point, November 27th of 2018, placed another call
17  to AT&T; is that right?
18  A. Yes, sir. I probably placed several in the
19  months to come. And then when I got the letter from
20  the collection agency, I called AT&T and had a
21  screaming, hysterical fit.
22  Q. Okay. We'll get to that.
23  A. Okay.

Page 27

1   Q. But after this November 8, 2018, letter, you
2   didn't receive any other bills from AT&T. Is that
3   right?
4   A. That's correct.
5   Q. But you were still concerned because you were
6   told in that conversation with Monique that you owed
7   the money?
8   A. That's correct.
9   Q. And so if I understand correctly, the next bit
10  of, I guess, mail that you got on this account was from
11  a collection agency, right?
12  A. Yes, sir.
13  Q. And I don't -- I'm sorry. I don't remember if
14  you had told me that you recalled the name of that
15  other collection agency or not?
16  A. No, sir. I don't recall it. I only had the one
17  letter from them. And on the bill that they sent me
18  for that AT&T bill, I wrote a dispute letter and told
19  them the circumstances of why I did not owe it. And
20  then I did not receive anything else from that company.
21  Q. I'm sorry. I didn't mean to cut you off.
22  A. That's okay. A few -- maybe three or four
23  months later, I received the first letter from I. C.

Page 28

1   Systems.
2   Q. So I know you don't have a copy of the letter
3   that you received from that first collection agency,
4   right?
5   A. No, sir. I don't.
6   Q. Do you have an idea of how long after you
7   received -- let's say how long after you had this
8   conversation with Monique in late September of 2018
9   that you heard from the first collection agency?
10  A. Oh, it was probably months before I got anything
11  from the collection agency, but I continued to call
12  AT&T to see what the status was. Some of them were
13  very helpful. A couple of them told me that it had
14  been turned over to a collection agency, and I would
15  each time say, "Please don't do that. I'm trying to
16  rebuild my credit."
17  Q. After the telephone conversation with Monique
18  and before you were contacted by I. C. System, how many
19  telephone calls do you think you had with someone from
20  AT&T?
21  A. Quite a few probably because I checked
22  frequently to see what the status of that account was
23  because she told me that it was going to go on my

Page 29

1   credit report. And so I have some credit counseling
2   from Credit Karma, and they have this little girl there
3   that's a computer-generated thing. Her name is Penny,
4   and you can ask questions. And then she will -- she
5   will answer them. And so the first idea that I had
6   that I. C. Systems had the account was I got that
7   little message from Penny saying there was a collection
8   account on my credit report. And I think that was the
9   beginning -- the latter part of '19 -- and don't hold
10  me to the dates because I'm not sure -- or maybe the
11  first of 2020.
12  Q. So if I understand correctly, you were concerned
13  about your credit report. And so you had apparently
14  signed up for Credit Karma, right?
15  A. I don't remember signing up with Credit Karma,
16  but they actually sent me an email telling me what was
17  available with them. And I just punched in and started
18  talking to them, and then they made recommendations how
19  to build my credit. And then I got the email from
20  Penny, which I don't think is a person. I think it's
21  just you talk to the computer when you type in there.
22  And they let me know that I did have a collection from
23  I. C. Systems on my credit report, that it needed some

8 (Pages 26 - 29)

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

Page 30

1 work.
2  Q. Okay. So if I understand correctly, it was
3 through this Credit Karma and this whatever Penny is?
4  A. Yes.
5  Q. You were notified that I. C. System had put
6 something on your credit report?
7  A. Yes, sir.
8  Q. Okay. So if I understand correctly -- well, let
9 me make sure I understand correctly. You got a letter,
10 I believe you said, from the first collection company,
11 right?
12  A. Yes, sir.
13  Q. And you had a conversation with someone there?
14  A. Not verbally, no, sir. I wrote a letter of
15 dispute and attached it to the letter they sent to me
16 and mailed it back to them.
17  Q. So you received the letter. You mailed that
18 letter along with your letter of dispute back to that
19 agency?
20  A. Yes, sir. And I gave all the details about why
21 AT&T was billing me and it was for a service I could
22 not receive because it was not available in my area.
23 And I never got anything else from that group of

Page 31

1 collectors.
2  Q. All right. So then they never called you or
3 anything like that?
4  A. No, sir, not that company. I only got one
5 letter from them.
6  Q. And you wrote a letter back, disputing the debt.
7 And then you never heard from them again?
8  A. No, sir.
9  Q. Is that right? Am I right?
10  A. Yes, sir.
11  Q. Let me see if I can switch. Now do you see a
12 different letter on your screen now?
13  A. Yes, sir.
14  Q. Okay. And this one is marked Exhibit 1. It's
15 dated 1/8/2021. Do you see that on the left-hand side
16 there, right under collection notice?
17  A. Oh, I'm sorry. I was just looking at the little
18 box. Yes, I do see that.
19  Q. All right. Now have you seen this letter before
20 today?
21  A. Yes, sir. That's probably the first letter that
22 I got from them.
23  Q. Let me ask you a question about that.

Page 32

1  A. Okay.
2  Q. If you look down towards the bottom here, was
3 that the address you lived at at that time?
4  A. That is my mailing address where I receive my
5 mail.
6  Q. Okay. Right. That's the P. O. Box you were
7 talking about?
8  A. Yes, sir.
9  Q. So that's your mailing address. So that would
10 have been the one that this letter was sent to, and you
11 remember receiving this letter, right?
12  A. Well, I got more than one letter from I. C.
13 System. So I remember getting letters from I. C.
14 System, and I called them when I got the letters. And
15 I wrote letters of dispute to them as well four times
16 about that. So I don't know if this is the first
17 letter I got. I don't think it is the first letter I
18 got.
19  Q. Why do you believe it's not the first letter?
20  A. Well, because of the date. Because I think that
21 I. C. Systems appeared on my credit report the latter
22 part of 2020. And I'm not certain about those dates,
23 but I believe it was the end of 2020.

Page 33

1  Q. When you saw that I. C. System had credit
2 reported you, did you do anything in terms of
3 contacting anyone about that?
4  A. I'm not sure if I called them regarding that
5 specifically. They called me a couple of times, but
6 I'm not sure of those dates. And I went over it very,
7 very thoroughly with them to tell them how that
8 occurred.
9  Q. All right. Now when you got this letter from I.
10 C. System, did you read it?
11  A. Yes, I read it.
12  Q. And maybe this sounds like a silly question, but
13 if I get a letter, I will usually read it -- if it's
14 important anyway -- two or three times. Did you read
15 this more than once?
16  A. I'm not sure about that. I'm not sure.
17  Q. And you see the part in the letter in the middle
18 towards the bottom where it says notice?
19  A. Yes, sir.
20  Q. Do you remember reading that part of this letter
21 or not?
22  A. I probably read all of it.
23  Q. Okay. And do you remember if you look at -- I

9 (Pages 30 - 33)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 34

1  think it's the second sentence under notice where it
2  says, "If you notify us in writing within 30 days from
3  receiving this notice that you dispute the validity of
4  this debt or any portion thereof, we will obtain
5  verification of the debt or obtain a copy of the
6  judgment and mail you a copy of such judgment or
7  verification."
8      A.  See down here on the very last where it says,
9  "If you make a request in writing within 30 days after
10  receiving this notice, we will provide you with the
11  name and address of the original creditor," which I
12  didn't -- I didn't write to them.  I called them.  And
13  I already knew who the collector was because it says
14  AT&T U-Verse, balance due 151.33, and I knew I did not
15  owe that.
16      Q.  All right.  When you got this letter, the one
17  that is Exhibit 1 from I. C. System, did you talk to
18  anyone about that letter?
19      A.  Yes, sir.  Whatever number they provided, I
20  called them and did speak with someone.  I'm not sure
21  who.  I did make a record of that.
22      Q.  And I scrolled down again.
23      A.  The toll free number.

Page 35

1      Q.  Yeah.  So that would have been the number that
2  you called?
3      A.  Probably.
4      Q.  That makes sense, right?  I mean, you
5  didn't go on the internet and search for a different
6  number, did you?
7      A.  No, sir.
8      Q.  All right.  And do you have any recollection of
9  how long after you received this letter that you would
10  have called I. C. System?
11      A.  No, sir, I don't.
12      Q.  Within days, weeks?
13      A.  I would think days because it always upset me to
14  see that, and I usually called.  And I probably called
15  AT&T on the same day too.
16      Q.  So in response to this letter from I. C. System,
17  you would have called AT&T again?
18      A.  Probably, because I called them several times.
19      Q.  Do you have a specific recollection of that or
20  are you just thinking that's probably what you did
21  because that's what you had been doing?
22      A.  Because that's what I had been doing, that's
23  correct.

Page 36

1      Q.  Now I know that we showed in this other exhibit
2  here that you had made notes about your conversation
3  with Angel and then Monique with AT&T.  When you spoke
4  with anyone from I. C. System, did you make notes of
5  those conversations?
6      A.  No, sir, not that I recall.  I didn't make any
7  notes.  A couple of the calls when they called me, I
8  was traveling.  And I talked to them from a vehicle,
9  and I didn't even make notes of the telephone
10  conversations because I was just trying to make them
11  understand I'm not going to pay this debt because I
12  don't owe it.  I don't owe it.  It was for a service
13  they could not provide.
14      Q.  I think though at some point, you said you did
15  place a call to I. C. System, right?
16      A.  Yes, sir, more than one.  I mean, I had to call
17  one of the people back that called me and left a
18  message, I think.  And I called them back, and then
19  they got me on the phone one day when I was traveling.
20  I answered, and we had a long conversation while I was
21  traveling.  So I didn't make any notes about that, but
22  I had some conversations with I. C. Systems.
23      Q.  Now let me show you another -- I think it's this

Page 37

1  one.  Can you see that one okay?
2      A.  Yes, sir.
3      Q.  All right.  So this is Exhibit 3, and this one
4  says "settlement offer."  Do you see that?
5      A.  Yes, sir.
6      Q.  All right.  And it has a date under that of
7  February 11, 2021, which is -- I think it's -- I can
8  double check here.  So that's about a month after the
9  first letter, right?
10      A.  Yes, sir.  Pretty close.
11      Q.  Yeah, pretty close.  So do you remember
12  receiving that letter?
13      A.  Yes, sir.  The settlement that they were
14  offering to reduce it, I think -- I would have to read
15  on here, but it seems like it was $75 or something like
16  that.  Yes, the amount of 75.67.  And I called them at
17  that time and told them that I would not pay that, not
18  75.67, not 151.33, because I did not owe it.
19      Q.  Do you remember having any conversation with
20  anyone at I. C. System about credit reporting?
21      A.  Not specifically, not -- not a certain person,
22  no, sir.
23      Q.  Well, do you recall having a conversation with

10 (Pages 34 - 37)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

1 anyone at I. C. System who told you that I. C. System
2 wouldn't credit report the account?
3    A. A lady told me on a call that they do not report
4 to the credit bureaus, that I. C. System does not
5 report to the credit bureau.
6    Q. Are you sure that's what was said?
7    A. Yes, sir.
8    Q. I think I asked you earlier if you reviewed any
9 call recordings or anything like that before your
10 deposition today, and you indicated you didn't,
11 correct?
12    A. I did.
13    Q. You did?
14    A. I did hear it, yes.
15    Q. You did hear the call recordings today?
16    A. Not today.
17    Q. When?
18    A. I'm not sure, but it's been a few weeks ago,
19 that recording. And the lady said we do not report to
20 credit bureaus.
21    Q. Do you remember her saying that during the call
22 as well?
23    A. Probably.

1    Q. Well, I mean, if I understand correctly, that
2 was a pretty important thing for you. You said you
3 were trying to rebuild your credit after your husband's
4 death?
5    A. Yes, sir. Yes, but they told me they did not
6 report to the credit bureau.
7    Q. Right. And I will represent to you that that
8 call was in early March of 2021. And so when you had
9 that conversation with that person in early March of
10 2021, did you come away with the understanding that I.
11 C. System wouldn't be credit reporting you?
12    A. I did.
13    Q. Did that -- I hate to use the word comfort, but
14 did that make you feel at least a little better?
15    A. No, sir, because it was still there. And I was
16 just trying to get it off my credit report period. I
17 just wanted it to go away.
18    Q. Now do you remember -- you talked about this
19 Penny feature of Credit Karma and at some point
20 learning through that that I. C. System had credit
21 reported you.
22    A. Yes.
23    Q. Was that before or after you had the call with

1 the person at I. C. System who indicated that I. C.
2 System doesn't credit report?
3    A. I'm sure it was before because I had applied for
4 a credit card. And when -- they declined me, and I was
5 embarrassed to death. And when I looked -- when I went
6 back to Credit Karma to look but I don't know what the
7 date was, I. C. Systems/AT&T U-Verse was on my credit
8 report.
9    Q. Okay. So if I understand correctly -- and by
10 the way, if at any point during this whole process --
11 I'm not going to sit here, and I promise you we won't
12 be going for more than another hour at best, okay? But
13 if at any point during this process you need to take a
14 five-minute break or whatever, you can just let me know
15 and I will be happy to do that.
16    A. Thank you so much, but I'm good.
17    Q. So if I understand what you are telling me
18 correctly, before you ever heard from I. C. System, you
19 had learned that I. C. System had in fact credit
20 reported the AT&T account; is that right?
21    A. I'm not going to say that's right because I'm
22 not sure of the date.
23    Q. Okay. Well, because the reason I ask is you

1 testified that there was this conversation you had with
2 someone at I. C. System, and you were told by that
3 person that I. C. System doesn't credit report, right?
4    A. That's correct.
5    Q. And it seems that if you were advised by the
6 Credit Karma Penny before that call that I. C. System
7 had in fact credit reported, that would have been
8 something that seemed really strange given the fact
9 this woman was telling you I. C. System doesn't credit
10 report. Are you following me?
11    A. Yes, sir, I do follow you. But there is one
12 other thing to it. It also said AT&T U-Verse on there
13 as well on that credit report, and then it had I. C.
14 Systems. So I didn't know if AT&T put it on there or
15 if I. C. Systems put it on there because it was listed
16 as an AT&T account on the credit report. I didn't know
17 if they reported it or if it came from I. C. Systems.
18    Q. Okay.
19    A. Showing that they were the collection agency. I
20 didn't know.
21    Q. So when you had that conversation and the woman
22 -- I think it was a woman, right?
23    A. Yes, it was.

11 (Pages 38 - 41)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 42

1    Q. When she said that I. C. System doesn't credit
2  report AT&T credit reports, right?
3    A. I got that impression from her, but that I. C.
4  System would not show it as I. C. System that I was in
5  debt to.
6    Q. Okay. And so I guess then it makes sense to you
7  because you weren't certain from that credit card Penny
8  thing whether it was AT&T and I. C. System that had
9  reported it, right?
10    A. Yes, sir. That's correct.
11    Q. That clears that up for me. I appreciate that.
12  Now I want to make sure I understand that you testified
13  that you had sent a letter -- when you got the letter
14  from the first collection agency, you put together a
15  dispute of some sort?
16    A. Yes, sir. I wrote it on a piece of tablet paper
17  and attached it to their bill and sent it back to them
18  with all my account numbers and the dates that I had
19  ordered the service and the dates that they told me
20  that it was not available in my area and that I never
21  received the service and to please verify that with
22  AT&T. I never heard from them again.
23    Q. Okay. And you didn't do that with I. C. System

Page 43

1  though, correct?
2    A. No, sir, I didn't.
3    Q. Okay.
4    A. But I called them.
5    Q. Right. I understand.
6    A. I did call them, yes.
7    Q. I understand. Now when you spoke to this person
8  at I. C. System who indicated that I. C. System doesn't
9  credit report, that AT&T does, had you at that point
10  talked to an attorney at all?
11    A. No, sir. Oh, wait a minute. I don't think I
12  had.
13    Q. Well, and again the other thing that I wanted to
14  make clear to you is that what I'm not doing here is
15  trying to impose some sort of memory exam on you. I
16  wouldn't want anyone to do that to me. And so I'm just
17  trying to find out as much as you can remember, okay?
18    A. Yes, sir.
19    Q. Did you -- when you found that was on your
20  credit report, did you contact -- let's go back and
21  let's say it was around the time of this letter or
22  before that, in February of 2021. I think you said at
23  the end of 2020 is when you think you learned there was

Page 44

1  something on your credit report. Did you contact any
2  of the credit reporting agencies at that point?
3    A. No, sir. And I'm not sure of that date of 2020.
4  I just know that I applied for a Belk's credit card in
5  2020, and they declined it.
6    Q. Do you remember when in 2020 that was with Belk?
7    A. It would have been at the end of the year,
8  probably during the Christmas sales.
9    Q. Christmas of 2020?
10    A. Possibly.
11    Q. Possibly?
12    A. I can't be absolutely sure.
13    Q. Well, again, I told you I grew up in Wisconsin.
14  So it was easier to know what time of year it was in
15  Wisconsin because everything was either dead because it
16  was winter or everything was alive because it was
17  summer. We only have two seasons in Wisconsin. So
18  down here, I live in Florida and so it's a little
19  different. I think we only have two seasons here,
20  summer and not summer.
21    A. Yes, sir.
22    Q. Do you recall having any other -- we talked
23  about one conversation you had with someone at I. C.

Page 45

1  System. Do you recall any other conversations with
2  someone at I. C. System?
3    A. Yes, sir. A lady called when I was traveling,
4  and she was very nice. And I told her the story. I
5  was probably on the phone with her for several minutes,
6  maybe 15. And I was trying to explain to her why I was
7  not going to pay it, and she seemed to have all the
8  sympathy in the world and just hated it so bad for me.
9  But apparently she -- I'm not sure if she called first
10  or the lady that said they didn't do the credit
11  reporting called first. I don't remember who was first
12  that I talked to, but I know that I talked to two
13  people there at length about my issue.
14    Q. Now do you remember if both of those were based
15  on calls that you received or calls that you made? I
16  think you said that the first one --
17    A. I think I called back on one, and I think I
18  answered one in my car. But don't hold me to that, but
19  I just know I talked to two people, two different
20  people.
21    Q. I understand. Was there a time that you learned
22  that I. C. System had in fact credit reported your
23  debt?

12 (Pages 42 - 45)

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

1    A. Yes, sir. From Penny at Credit Karma, that was
2  later after the initial turndown from Belk's. I got
3  notice from Penny, but I'm not sure what the date was
4  or how long it was after I was turned down that I got a
5  notification from Credit Karma, said my credit report
6  needed some work because there was a collection on my
7  credit report that had not been paid.
8    Q. Do you believe that was before that you learned
9  that, that I. C. System was actually credit reporting
10  the account, before or after you had that initial
11  conversation with the woman who said that I. C. System
12  doesn't credit report?
13    A. No, sir. I don't remember because she
14  volunteered that because I told her that it was on my
15  credit report. I didn't ask her did I. C. Systems
16  report that on my credit. I didn't ask her
17  specifically that. I told her it was on my credit, and
18  she said I. C. Systems doesn't report to the credit
19  bureau.
20    Q. Is that something you remember her saying today?
21    A. I do remember her saying that.
22    Q. Because if I understand correctly, from what we
23  have talked about today, it seems like you were

1  certainly upset that AT&T was charging you for the
2  service that you never had. But it seems to me your
3  biggest concern was trying to protect your credit; is
4  that right?
5    A. I was concerned about trying to protect my
6  credit, but if you have a collection on it, it does a
7  number on your credit report. You can't build any
8  credit if you have a collection listed on your credit
9  report.
10    Q. Right. And you found that out when you tried to
11  get the Belk card, right?
12    A. Or shortly thereafter because I looked it up.
13  The Credit Karma, I can go in at any time and just
14  punch in my user name and password, and I can look at
15  anything that's on my credit report. That's going to
16  affect my credit. Like if you are trying to get a
17  credit card and they do a hard inquiry on your credit
18  report, then it makes your numbers drop. But if I look
19  at my own record, it doesn't affect my credit. So I
20  check it frequently. But I'm not sure of the dates
21  that I. C. Systems had that on there.
22    Q. Right. I understand. I do understand. Now I
23  showed you two different letters, the January 2021

1  letter from I. C. System and then this second one that
2  came in February of 2021. Do you remember receiving
3  any other letters from I. C. System?
4    A. Possibly because there was a few months there
5  where I did hear from them pretty often. But I just
6  quit opening them because I had so many conversations
7  with -- and I'm not sure how many they sent. Maybe
8  one. But if they sent a letter, I stopped reading them
9  because it was very upsetting to me because I had many
10  conversations, lengthy conversations, telling them that
11  I didn't owe this debt and tried to explain to them why
12  I did not owe this debt. And it seemed to me like all
13  they had to do was to look and see why I didn't owe
14  this debt because I tried to explain to them it wasn't
15  available in my area. So if they had just checked with
16  AT&T, it seems like they would have discovered that.
17  If somebody disputes something long enough, you would
18  think they would say, "Wait a minute. We need to check
19  and see if this is the truth."
20    Q. If I understand, if we go back to -- I think
21  this was Exhibit 4. This was all the way back in 2018
22  that you had had leading up to this point in November
23  of 2018 several conversations with various people at

1  AT&T who apologized to you for billing, right?
2    A. Yes, sir. They did.
3    Q. And then you got this November 18, 2018, letter
4  saying that you owe them money and we're going to send
5  you to collections, right?
6    A. Yes, sir, basically.
7    Q. And then you called into AT&T on November 27th
8  of 2018 and ultimately spoke to someone named Monique
9  who then told you, "well, you owe the money," right?
10    A. Yes, she did.
11    Q. Right. After these other AT&T employees had
12  been apologizing to you and leading you to believe that
13  it would be handled, right?
14    A. Yes, sir.
15    Q. So it seems like AT&T had a tough time deciding
16  whether or not you owed the debt?
17    A. Well, seems the final straw was that I did owe
18  the debt.
19    Q. Let me show you this letter. Okay. Now this is
20  Exhibit 2 to your deposition. I'm going to make this
21  smaller so that we can see more of it. Okay. Now let
22  me show you the bottom here. Is that your signature
23  here?

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 50

1  A. Yes, sir.

2  Q. All right. Now we'll go back to the top. And

3  it says "via certified mail" and it says "Trans Union

4  Consumer Relation." Do you see that at the top?

5  A. Yes, sir.

6  Q. Is this a letter that you sent?

7  A. Yes, sir.

8  Q. And let me go down again here. I don't -- do

9  you know when you sent that?

10  A. No, sir. I don't know the date that I sent it.

11  I don't see the date on the letter.

12  Q. I don't see a date on the letter. It's my

13  understanding based upon information that's been

14  provided in this case that this was sent in May of

15  2022. Does that --

16  A. That's probably correct, yes, sir.

17  Q. Now by that time in May of 2022, had I. C.

18  System stopped contacting you?

19  A. I think maybe March of 2022, I'm thinking, may

20  have been the last lengthy conversation I had with IC

21  Systems, but the debt remained on my credit report.

22  And I was just trying to find a way to resolve it.

23  Q. So you sent this letter to Trans Union. Did you

Page 51

1  send a letter like this to I. C. System?

2  A. Yes, sir.

3  Q. Now the letter that you sent to I. C. System,

4  did you keep a copy of that?

5  A. Probably one in my file.

6  Q. When you say your file, the file you have at

7  home?

8  A. And/or my attorney's file because I had him to

9  review my letters. And he actually mailed them for me.

10  MR. SEALS: Make sure you don't say what we

11  talked about.

12  THE WITNESS: Oh, no, sir.

13  Q. (BY MR. GOLDEN) I'm not entitled to that, and

14  I'm not seeking that.

15  MR. SEALS: And for the record, I don't

16  feel like you are asking for that.

17  Q. (BY MR. GOLDEN) Right. And at some point

18  then -- again, I think actually it was May 11th that

19  this was dated. That was my memory, and counsel will

20  correct me if I'm wrong. May 11, 2022?

21  MR. SEALS: Sounds right.

22  Q. (BY MR. GOLDEN) At some point before that then,

23  you had finally decided to see a lawyer, right?

Page 52

1  A. I had decided to find out what my options were,

2  how anybody could help me because I felt helpless,

3  hopeless. I had talked to everyone that I knew to talk

4  to. I even called the Alabama attorney general's

5  office to get advice, and she said she would send me a

6  form. And reading over the form, I didn't see where

7  any of it would be helpful. So I called an

8  acquaintance who handled something for me that's an

9  attorney. He handled something for me when my husband

10  died, and I told him my situation. And I said, "Is

11  there any hope for me, help for me? Can you recommend

12  anything?" And he said, "Yeah. I'm going to send you

13  to somebody." So he gave me some numbers of Mr. Seals

14  and Julia Cochrun and two others. And I decided on --

15  I liked the name Whitney. So I made contact with him

16  and explained my situation to him. And he said --

17  MR. SEALS: Whoa, whoa.

18  A. -- he could help me.

19  Q. I think Mr. Seals' parents named him Whitney

20  just for that purpose.

21  MR. SEALS: Exactly. They were pretty much

22  long game, yeah.

23  MR. GOLDEN: Like what name can we give him

Page 53

1  that will ensure success in the future?

2  MR. SEALS: That's it.

3  MR. GOLDEN: My parents didn't have that

4  same conversation.

5  Q. So if I understand correctly, this letter was

6  something that came out of -- let me go back and ask

7  that a different way. So this was a letter that your

8  attorney helped you put together?

9  A. Well, he reviewed it carefully.

10  Q. Okay. That's fair enough. So you drafted this.

11  You had your attorney review it, and then you mailed

12  it?

13  A. No, sir. He told me --

14  MR. SEALS: Not he told you.

15  A. He mailed it for me.

16  Q. (BY MR. GOLDEN) There you go.

17  A. We sent it certified mail. And I paid for the

18  postage, and he mailed it.

19  Q. All right. Now your testimony is that you sent

20  -- you believe you sent a letter to I. C. System as

21  well, right?

22  A. Yes, sir.

23  Q. Around the same time as this one?

14 (Pages 50 - 53)

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

Page 54

1    A. Yes, sir.
2    Q. Would it have been different than this one?
3    A. No, sir. Probably basically said the same
4 thing, that it was a debt that I didn't owe and that I
5 was trying to clear it up and trying to get it off my
6 credit.
7    Q. Did you hear back from Trans Union in response
8 to this letter?
9    A. Yes, sir, I did.
10    Q. How did you hear back from Trans Union? Was it
11 a letter?
12    A. They sent a letter back, saying that my debt had
13 been verified.
14    Q. Do you know how long it was after you sent this?
15    A. It was weeks before I heard -- I sent all of the
16 credit bureaus the letter, and I. C. Systems. And it
17 was sometime -- some responded fairly quickly. Others
18 did not respond for a while.
19    Q. How many letters like this did you send out or
20 have your attorney send?
21    A. Four?
22        MR. SEALS: Your testimony.
23    A. Three or four.

Page 55

1    Q. (BY MR. GOLDEN) All right.
2    A. I could name them for you but --
3    Q. Yeah. So you sent one to Trans Union?
4    A. Yes, sir.
5    Q. I understand you sent one to I. C. System?
6    A. Yes, sir.
7    Q. Do you know who else you sent it to?
8    A. Yes, sir. Equifax and Experian.
9    Q. Okay. And did you get responses from each one
10 of them?
11    A. Yes, sir.
12    Q. So this is the response you got -- or I'm sorry.
13 This is not the response you got from Trans Union. You
14 testified about that though. You said that it had been
15 verified as accurate, right?
16    A. Yes, sir.
17    Q. What did you get from Equifax? Do you recall?
18    A. Equifax said that they investigated and that
19 they found the debt not to be something that I owed,
20 was not accurate. And then from Experian, I got a
21 letter stating that they needed more information on me
22 to document, that would identify me; driver's license,
23 Social Security card, mailing address, power bill. I

Page 56

1 could choose which ones that I sent them. I sent all
2 of them. Just the last four of my Social, driver's
3 license, my power bill and my DirecTV bill to see that
4 they had the right person. They wanted to make sure
5 they had the right person. And then once I sent all
6 that information, I did not hear anything else from
7 Experian. They did not respond to the last letter that
8 I sent.
9    Q. Did you hear anything back from I. C. System in
10 response to your letter?
11    A. Yes, sir. They said the debt had been
12 investigated, and it was a legitimate debt.
13    Q. Was that a letter from I. C. System?
14    A. I believe it was, sir.
15    Q. Do you know if Experian removed it from your
16 credit report?
17    A. No, sir. The only two that I can see on my
18 credit report is Equifax and Trans Union. Those are
19 the only two reporting credit unions that I can see on
20 Credit Karma. So I don't know if Experian took it off.
21 I never got any response on the last letter.
22    Q. All right. So do you know -- when is the last
23 time you got an update from Credit Karma or Penny on

Page 57

1 how your credit report looks with respect to this
2 account?
3    A. Yesterday.
4    Q. Yesterday?
5    A. Yes.
6    Q. Okay. So as of yesterday, what can you tell me
7 about whether it's being credit reporting?
8    A. Equifax has my credit score at 762. Trans Union
9 has me at 640.
10    Q. Do you know if this specific AT&T debt is still
11 on your credit report?
12    A. No, sir. It was removed.
13    Q. So it was removed by all of them?
14    A. Yes, sir, I believe so.
15    Q. Again, I mean, if I understand correctly --
16    A. I don't see it. There is no collections on my
17 credit report at this time.
18    Q. Okay. Are you able to -- and I want to make
19 sure I understand this. Are you able to see what's on
20 your Experian credit report?
21    A. No, sir. I don't know if they don't report to
22 Credit Karma or if Credit Karma does not have access to
23 Experian. The only two that they show me is the Trans

15 (Pages 54 - 57)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 58

1  Union and the Equifax.
2      Q.  Do you know if this account is on the Experian
3  credit report?
4      A.  No, sir.  But there is nothing showing on my
5  credit report.  So they show me an entire copy of my
6  credit report.  But the two credit reporting numbers
7  that I get, my -- whatever that's called where your 762
8  or 640, that's only two, Trans Union and Equifax.
9      Q.  I think that's called the FICA score.
10     A.  Whatever it is.
11     Q.  Yeah.  So let me ask you:  As part of this
12  lawsuit, are you claiming damages as a result of what
13  I. C. System did in this case?
14     A.  Yes, sir.
15     Q.  Are you able to tell me what in your own words
16  those damages are?
17     A.  Yes, sir.  I have lost lots of sleep.  I have
18  cried lots of tears.  I have had shingles to erupt on
19  my body from being distraught and upset.  Feeling
20  hopeless, helpless, embarrassed, humiliated.  My
21  daughters were present at one point when I applied for
22  a Belk's card, and the lady, sales lady, came back and
23  said I was declined.  I started crying.  My children

Page 59

1  got very upset because they couldn't understand, and
2  they didn't know anything about what I was fighting
3  with my credit report.  And it had been ten years after
4  a bankruptcy before my husband died, and I thought I
5  could apply for a credit card and not have any issue.
6  And then it came back declined, and I did that twice to
7  Belk's and twice to Kohl.  And the last time at Belk's
8  was immediately after this was removed from my credit
9  report, and they approved my card, the first credit
10  card I have had in all those years.  But it was only
11  after the letters from the attorney and me speaking to
12  an attorney that they removed it from my credit report,
13  and I was able to have a Belk's credit card.
14     Q.  When was that that you got that Belk's credit
15  card?
16     A.  That would have been the latter part of 2022,
17  maybe early fall.  Or whenever they took it off, I
18  applied right after that.  It hasn't been that long ago
19  because it hasn't been gone that long.
20     Q.  When this information was on your credit report,
21  were you -- I know you indicated that you had been
22  denied a credit card by Belk's twice and by Kohl's
23  twice.  I think that's what you said?

Page 60

1      A.  Yes, sir.
2      Q.  Were there any other places where you applied
3  for a credit card and actually received one?
4      A.  Not prior to them removing the collection from
5  my credit report.  I did apply at Penny's suggestion, I
6  guess computer generated, that I apply to Capital One,
7  but that was about the same time that this was taken
8  off my credit.  And they thought if I had a credit
9  card, that would be an easier way to improve my credit
10  score.  And I did apply for Capital One about the same
11  time I applied for the Belk's, and they were both
12  issued.  They were approved.  I did not get declined by
13  either after they removed this from my credit.
14     Q.  Did you have credit cards at the time?
15     A.  At the time of?
16     Q.  Yeah.  That wasn't great, was it?
17     A.  I did not have any credit cards prior to.  Since
18  2009.
19     Q.  So when you finally got approved for the Belk's
20  card and the Kohl's card, was that the first time you
21  had had a credit card?
22     A.  I didn't get a Kohl's.  I didn't reapply to
23  Kohl's, but I did reapply to Belk's.  And I applied to

Page 61

1  Capital One, and that was the first credit card that
2  was issued to me since 2009.
3      Q.  Since 2009?
4      A.  Yes, sir.
5      Q.  When was the bankruptcy?
6      A.  2009.  Two weeks before my husband passed.
7      Q.  And what type of bankruptcy was filed?  Was it a
8  Chapter 7?
9      A.  I'm not sure.  We only filed against medical
10  bills that totaled 41,000, and I didn't file against my
11  house or my car or anything like that, just against the
12  medical bills because he was about to have another big
13  surgery, which he did not think that he would survive.
14  So he said, "Please file bankruptcy.  I don't want to
15  leave you with this debt, credit card debt."  So we did
16  that.  And then three days after they approved the
17  bankruptcy, he died.
18     Q.  And then I assume for some time then after the
19  bankruptcy, you had issues with your credit, right?
20     A.  I don't think so because I got some life
21  insurance when he died, which I had to get an attorney
22  to help me get it all.  And then my life insurance
23  proceeds were paid back to my credit card companies

16 (Pages 58 - 61)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 62

1  that I filed against.  They took the proceeds from my
2  life insurance and paid those debts off.  But I didn't
3  have credit cards because they said even though we paid
4  them off, the bankruptcy would remain on my record.  So
5  I never applied for a credit card.
6      Q.  Do you know when the bankruptcy came off your
7  report?
8      A.  Yes, sir.  I think it was -- Doug died on March
9  the 9th of 2009, and I think I didn't see it any more
10 after maybe May or June of 2019.
11     Q.  Now is it accurate for me to say that to the
12 extent that you had any possession of any documents
13 related to this case, including any letters to or from
14 I. C. System or anybody else regarding this account,
15 that you would have given copies or the originals to
16 your attorney?
17     A.  Yes, sir.
18     Q.  Were you -- you seem like the kind of person who
19 is pretty organized.  So would that have been something
20 that if you had sent a letter, you wanted to make sure
21 that you kept a copy?
22     A.  Actually I did get copies, two of the letters
23 that we sent to the credit bureau and to I. C. System.

Page 63

1  I'm sure that he gave me copies of those letters, and I
2  feel like we have retained them in the file.
3          MR. GOLDEN:  Okay.  I think that's all the
4  questions I have for you, Ms. Dorsey.  I appreciate
5  your patience.
6          THE WITNESS:  Thank you.
7          MR. SEALS:  Mr. Golden, I'm not sure if I
8  have anything or not.  Can I have just a moment?
9          MR. GOLDEN:  Of course.
10             (Recess taken.)
11         MR. SEALS:  I was digging through, and I
12 believe you produced this, Mr. Golden.  I was digging
13 through my file.
14
15 EXAMINATION BY MR. SEALS:
16     Q.  Was the name of the first collection agency
17 Franklin Collection Service, Inc?
18     A.  Yes.  That sounds familiar.
19     Q.  And I have got one letter that you provided to
20 me dated October 2nd, 2019.  Would that have been
21 roughly when they contacted you?
22     A.  Around the time, yes.
23     Q.  Did that also deal with AT&T U-Verse Net?

Page 64

1      A.  Yes.
2      Q.  I just wanted to make sure that was clear on the
3  record.
4      A.  Yes.  The amount is exactly the same.
5          MR. SEALS:  Okay.  That's it.
6          MR. GOLDEN:  I appreciate that.
7
8          (Deposition concluded at 10:32 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 65

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA)
4  JEFFERSON COUNTY)
5
6      I hereby certify that the above and foregoing
7  proceeding was taken down by me by stenographic means,
8  and that the questions and answers therein were
9  produced in transcript form by computer aid under my
10 supervision, and that the foregoing represents, to the
11 best of my ability, a true and correct transcript of
12 the proceedings occurring on said date at said time.
13     I further certify that I am neither of counsel
14 nor of kin to the parties to the action; nor am I in
15 anywise interested in the result of said case.
16     Signed the 11th day of May, 2023.
17
18
19          Anne E. Miller
20          ACCR #486
21          Expires 9/30/23
22          My commission expires 11/19/23
23

17 (Pages 62 - 65)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Page 66

1  W. Whitney Seals
2  whitney@cochrunseals.com
3       May 12, 2023
4  RE: Dorsey, Sharon v. Trans Union, LLC And I.C. Syatem, Inc.
5  5/11/2023, Sharon Dorsey (#5909018)
6  The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-southeast@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 67

1  Dorsey, Sharon v. Trans Union, LLC And I.C. Syatem, Inc.
2  Sharon Dorsey (#5909018)
3       E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Sharon Dorsey            Date
25

Page 68

1  Dorsey, Sharon v. Trans Union, LLC And I.C. Syatem, Inc.
2  Sharon Dorsey (#5909018)
3       ACKNOWLEDGEMENT OF DEPONENT
4     I, Sharon Dorsey, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Sharon Dorsey            Date
13  *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18       _____
19       NOTARY PUBLIC
20
21
22
23
24
25

18 (Pages 66 - 68)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

**[& - acknowledgment]**

| & | 2 | 300 3:5 | 9 |
|---|---|---|---|

**&**  3:4

**2**  3:18 49:20
**20**  68:15
**2009**  60:18 61:2
  61:3,6 62:9
**2018**  18:12 24:7
  24:20 26:16
  27:1 28:8 48:21
  48:23 49:3,8
**2019**  62:10
  63:20
**2020**  29:11
  32:22,23 43:23
  44:3,5,6,9
**2021**  8:1 37:7
  39:8,10 43:22
  47:23 48:2
**2022**  50:15,17
  50:19 51:20
  59:16
**2023**  1:19 4:4
  65:16 66:3
**205**  8:8,9
**22**  3:20 13:12
**25**  9:12 12:14
**27th**  24:7 26:16
  49:7
**289-9021**  8:9
**2:22**  1:6
**2nd**  63:20

**0**

**01489**  1:6

**1**

**1**  3:17 31:14
  34:17
**1/8/2021**  31:15
**101**  17:14 18:5
**101.33.**  18:5
  19:14
**10:32**  64:8
**11**  1:18 4:3 37:7
  51:20
**11/19/23**  65:22
**11/27/18**  22:20
**1135**  3:9
**1146**  9:9
**11th**  51:18
  65:16
**12**  66:3
**15**  45:6
**151.33**  34:14
  37:18
**16**  12:12
**18**  19:22 49:3
**18308**  65:18
**18th**  16:11
**19**  29:9
**1967**  10:2
**1970**  10:4

**31**  3:17
**33619**  3:9
**35203**  3:5
**37**  3:19

**9/30/23**  65:21
**9021**  8:11
**9:00**  4:4
**9th**  62:9

**a**

**a.m.**  4:4 64:8
**ability**  65:11
**able**  19:13 57:18
  57:19 58:15
  59:13
**above**  4:5 65:6
  66:6 68:7
**absolutely**
  44:12
**aca**  1:6
**access**  57:22
**accomplished**
  21:18
**account**  16:5,9
  16:10,14 22:3,7
  24:13 26:3
  27:10 28:22
  29:6,8 38:2
  40:20 41:16
  42:18 46:10
  57:2 58:2 62:14
**accr**  65:20
**accuracy**  66:9
**accurate**  55:15
  55:20 62:11
**acknowledge...**
  68:3
**acknowledgm...**
  66:12

**4**

**4**  3:14,20 22:15
  23:21 48:21
**41,000**  61:10
**47**  13:10
**486**  65:20
**49**  3:18

**5**

**5/11/2023**  66:5
**5351**  7:15
**5909018**  66:5
  67:2 68:2

**6**

**601-1146**  8:9
**63**  3:15
**640**  57:9 58:8

**7**

**7**  61:8
**70**  10:9
**74**  10:9
**75**  37:15
**75.67**  37:18
**75.67.**  37:16
**762**  57:8 58:7

**8**

**8**  27:1
**899**  7:10

**3**

**3**  3:19 37:3
**30**  9:12 34:2,9
  66:17

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 1**

**acquaintance**
52:8
**acting** 4:2
**action** 65:14
**actual** 18:2
**actually** 12:12
17:5 22:16
29:16 46:9 51:9
51:18 60:3
62:22
**additions** 68:6
**address** 7:8,12
7:17,18 32:3,4,9
34:11 55:23
**adjuster** 12:10
**adjusting** 12:9
**advice** 52:5
**advised** 41:5
**affect** 22:11
47:16,19
**afford** 9:19
**agencies** 44:2
**agency** 15:6,9
15:11 18:22
19:5 22:8,10
26:6,20 27:11
27:15 28:3,9,11
28:14 30:19
41:19 42:14
63:16
**agent** 8:15
11:11,12
**ago** 5:13 6:20,21
38:18 59:18

**agreed** 1:16,21
**aid** 65:9
**alabama** 1:2 3:5
4:2 52:4 65:3
**alive** 44:16
**allotted** 66:20
**allstate** 12:3,4
12:13,18
**amount** 37:16
64:4
**angel** 23:1,7,12
36:3
**angela** 22:23
**anne** 1:19 3:12
4:1 65:19
**answer** 5:19
29:5
**answered** 17:17
36:20 45:18
**answers** 6:9
65:8
**anybody** 52:2
62:14
**anyway** 5:14
33:14
**anywise** 65:15
**apologetic**
25:10
**apologized** 20:2
49:1
**apologizing**
49:12
**apparently**
29:13 45:9

**appeared** 32:21
**appearing** 3:3,7
**appended** 68:7
**applicable** 66:8
**applied** 8:20
40:3 44:4 58:21
59:18 60:2,11
60:23 62:5
**apply** 59:5 60:5
60:6,10
**appreciate**
42:11 63:4 64:6
**approved** 59:9
60:12,19 61:16
**area** 13:13
16:15 30:22
42:20 48:15
**arrington** 3:5
**asked** 24:11,13
25:4 38:8
**asking** 5:19
51:16
**assign** 2:2
**assume** 20:2
26:9 61:18
**assumption**
10:18
**at&t** 3:21 15:4,9
15:10 16:7,7,13
16:19 17:4,9,12
18:2,11,18 19:2
19:17,19 20:21
21:6,23 24:6,10
25:10 26:3,12
26:17,20 27:2

27:18 28:12,20
30:21 34:14
35:15,17 36:3
40:7,20 41:12
41:14,16 42:2,8
42:22 43:9 47:1
48:16 49:1,7,11
49:15 57:10
63:23
**attached** 3:18
3:19,20,21 16:2
30:15 42:17
66:11
**attempting** 16:6
**attorney** 6:10
43:10 52:4,9
53:8,11 54:20
59:11,12 61:21
62:16 66:13
**attorney's** 51:8
**attorneys** 9:14
**august** 18:20
**available** 8:19
9:20 16:15,18
17:7 29:17
30:22 42:20
48:15 66:6

**b**

**back** 8:1 15:13
30:16,18 31:6
36:17,18 40:6
42:17 43:20
45:17 48:20,21
50:2 53:6 54:7
54:10,12 56:9

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

**[back - cell]**

58:22 59:6 61:23

**background** 10:1

**bad** 45:8

**bag** 9:11,16,17 9:19

**balance** 22:7 34:14

**bankruptcy** 59:4 61:5,7,14 61:17,19 62:4,6

**barrier** 20:17

**based** 45:14 50:13

**basically** 10:4 49:6 54:3

**basis** 12:16

**beginning** 4:4 14:13 29:9

**believe** 23:14 25:23 30:10 32:19,23 46:8 49:12 53:20 56:14 57:14 63:12

**belk** 44:6 47:11

**belk's** 44:4 46:2 58:22 59:7,7,13 59:14,22 60:11 60:19,23

**best** 40:12 65:11

**better** 12:2 39:14

**big** 61:12

**biggest** 47:3

**bill** 14:22 15:2 18:2,5,10,14,17 18:17 19:21 20:4,6,10 21:1 21:23 25:22,22 27:17,18 42:17 55:23 56:3,3

**billing** 24:14 25:3 30:21 49:1

**bills** 18:11,17 27:2 61:10,12

**birmingham** 3:5 10:3,6

**bit** 27:9

**bite** 5:10

**blount** 7:10 13:1

**blvd** 3:5

**board** 13:1

**body** 58:19

**books** 11:15

**bottom** 32:2 33:18 49:22

**box** 31:18 32:6

**break** 40:14

**build** 29:19 47:7

**bundled** 16:10 16:22

**bureau** 38:5 39:6 46:19 62:23

**bureaus** 22:11 38:4,20 54:16

**c**

**c** 3:1 4:21 6:9,23 14:14,21 15:1,3 15:8,16,19 16:5 27:23 28:18 29:6,23 30:5 32:12,13,21 33:1,10 34:17 35:10,16 36:4 36:15,22 37:20 38:1,1,4 39:11 39:20 40:1,1,7 40:18,19 41:2,3 41:6,9,13,15,17 42:1,3,4,8,23 43:8,8 44:23 45:2,22 46:9,11 46:15,18 47:21 48:1,3 50:17 51:1,3 53:20 54:16 55:5 56:9 56:13 58:13 62:14,23 65:1,1

**cable** 16:23

**call** 6:13,14,17 6:22 20:14 22:15 23:13 26:16 28:11 36:15,16 38:3,9 38:15,21 39:8 39:23 41:6 43:6

**called** 13:1 14:19 16:8,13 17:12 18:6,14 19:5,10,16 20:1

20:9,10 21:6 26:4,20 31:2 32:14 33:4,5 34:12,20 35:2 35:10,14,14,17 35:18 36:7,17 36:18 37:16 43:4 45:3,9,11 45:17 49:7 52:4 52:7 58:7,9

**calls** 23:10 28:19 36:7 45:15,15

**capacity** 13:3

**capital** 60:6,10 61:1

**car** 45:18 61:11

**card** 40:4 42:7 44:4 47:11,17 55:23 58:22 59:5,9,10,13,15 59:22 60:3,9,20 60:20,21 61:1 61:15,23 62:5

**cards** 60:14,17 62:3

**care** 13:11 18:9

**carefully** 53:9

**case** 1:6 6:5,16 6:18 50:14 58:13 62:13 65:15

**cause** 4:5

**cell** 8:11,13 9:8 9:10,20

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 1**

certain 32:22 37:21 42:7
certainly 47:1
certified 50:3 53:17
certify 4:2 65:6 65:13
ceu's 10:5
change 67:4,7 67:10,13,16,19
changes 66:10 68:6
chapter 61:8
characterize 24:8
charging 47:1
check 37:8 47:20 48:18
checked 28:21 48:15
checkups 14:12
children 58:23
choose 56:1
christmas 44:8 44:9
circumstances 27:19
city 12:20
claiming 58:12
claims 12:9,11
clear 43:14 54:5 64:2
cleared 23:9
clears 42:11

client's 14:14
close 13:16 37:10,11
closest 13:17
cochrun 3:4 52:14
cochrunseals.... 66:2
collect 14:20 15:10 16:6
collected 11:16
collection 3:18 15:6,9 18:22 19:5 22:8,10 25:8 26:6,20 27:11,15 28:3,9 28:11,14 29:7 29:22 30:10 31:16 41:19 42:14 46:6 47:6 47:8 60:4 63:16 63:17
collections 21:4 49:5 57:16
collector 14:22 15:16 34:13
collectors 15:2 31:1
come 20:19 21:1 26:19 39:10
comfort 39:13
commission 65:22
commissioner 1:19 4:2

community 10:10
companies 61:23
company 5:10 11:6,7,10,21 14:15,17 25:8 27:20 30:10 31:4
complete 68:8
completed 66:17
computer 29:3 29:21 60:6 65:9
concern 47:3
concerned 26:10 27:5 29:12 47:5
concluded 64:8
consumer 50:4
contact 43:20 44:1 52:15
contacted 15:2 28:18 63:21
contacting 15:8 33:3 50:18
continued 28:11
contract 12:22
contracted 16:7 16:11
contractor 12:5
conversation 19:16,20 20:19 22:21 23:2,6 24:20,23 25:9

26:1,2,9,10 27:6 28:8,17 30:13 36:2,20 37:19 37:23 39:9 41:1 41:21 44:23 46:11 50:20 53:4
conversations 6:22 7:2 19:1,9 20:18 36:5,10 36:22 45:1 48:6 48:10,10,23
copies 62:15,22 63:1 66:14
copy 18:23 21:14 28:2 34:5 34:6 51:4 58:5 62:21
correct 8:9 10:21 13:4 23:19 27:4,8 35:23 38:11 41:4 42:10 43:1 50:16 51:20 65:11 68:8
corrections 68:6
correctly 17:4 18:13 20:9 21:22 25:9 26:8 26:15 27:9 29:12 30:2,8,9 39:1 40:9,18 46:22 53:5 57:15

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

**counsel** 1:17,23 2:1 51:19 65:13 66:14
**counseling** 29:1
**county** 7:10 13:1 65:4
**couple** 14:18 16:12 17:11 28:13 33:5 36:7
**course** 63:9
**court** 1:1 3:12 4:1 5:17,22 8:7
**credit** 19:7 22:11,12 26:7 28:16 29:1,1,2,8 29:13,14,15,19 29:23 30:3,6 32:21 33:1 37:20 38:2,4,5 38:20 39:3,6,11 39:16,19,20 40:2,4,6,7,19 41:3,6,7,9,13,16 42:1,2,7 43:9,20 44:1,2,4 45:10 45:22 46:1,5,5,7 46:9,12,15,16 46:17,18 47:3,6 47:7,8,8,13,15 47:16,17,17,19 50:21 54:6,16 56:16,18,19,20 56:23 57:1,7,8 57:11,17,20,22 57:22 58:3,5,6,6

59:3,5,8,9,12,13 59:14,20,22 60:3,5,8,8,9,13 60:14,17,21 61:1,15,19,23 62:3,5,23
**creditor** 34:11
**cried** 58:18
**crying** 58:23
**cs** 66:15
**current** 7:17
**currently** 8:21
**customer** 17:14
**customers** 12:15
**cut** 27:21
**cv** 1:6

**d**

**d** 3:13
**dale** 3:8 4:20
**damages** 58:12 58:16
**date** 4:3 16:13 22:7,19,21,23 32:20 37:6 40:7 40:22 44:3 46:3 50:10,11,12 65:12 67:24 68:12
**dated** 31:15 51:19 63:20
**dates** 29:10 32:22 33:6 42:18,19 47:20
**daughter** 7:16 17:10

**daughters** 58:21
**day** 12:23 20:15 23:11 24:18 35:15 36:19 65:16 68:15
**days** 10:10 16:12,12 34:2,9 35:12,13 61:16 66:17
**dead** 44:15
**deal** 16:8 63:23
**dealing** 12:15
**death** 19:7 26:7 39:4 40:5
**debit** 11:11,11 11:12
**debt** 14:20 15:7 15:9,10 16:3 22:11 26:13 31:6 34:4,5 36:11 42:5 45:23 48:11,12 48:14 49:16,18 50:21 54:4,12 55:19 56:11,12 57:10 61:15,15
**debts** 62:2
**decided** 51:23 52:1,14
**deciding** 49:15
**declare** 68:4
**declined** 40:4 44:5 58:23 59:6 60:12

**deemed** 68:6
**defendant** 3:7
**defendant's** 3:16
**defendants** 1:8
**degree** 10:6 11:2
**denied** 59:22
**deponent** 66:13 68:3
**deposing** 66:13
**deposition** 1:11 1:18 2:3 4:22 5:2,9,11 6:2 38:10 49:20 64:8
**describe** 13:13
**details** 30:20
**diagnosed** 13:10 14:9
**died** 52:10 59:4 61:17,21 62:8
**different** 8:3 31:12 35:5 44:19 45:19 47:23 53:7 54:2
**digging** 63:11 63:12
**directly** 19:2
**directv** 16:10,17 17:16,20 56:3
**discovered** 48:16
**disease** 13:11

dish  9:2
dispute  15:4,13
  16:2 27:18
  30:15,18 32:15
  34:3 42:15
disputes  48:17
disputing  31:6
distraught
  58:19
district  1:1,2
document  55:22
documents  6:4
  6:8,11 62:12
dog  5:10
doing  35:21,22
  43:14
dollar  10:10,11
door  11:16,17
  13:10
dorsey  1:4,11
  1:18 4:4,8 5:1,2
  63:4 66:4,5 67:1
  67:2,24 68:1,2,4
  68:12
double  37:8
doug  62:8
drafted  53:10
drive  3:9
driver's  55:22
  56:2
drop  47:18
due  22:7 34:14
duly  4:9

**e**

e  1:19 3:1,1,12
  3:13 4:1 65:1,1
  65:19 67:3,3,3
earlier  19:20
  38:8
early  39:8,9
  59:17
easier  44:14
  60:9
easy  5:22
education  13:1
educational
  9:23
either  17:3
  44:15 60:13
elementary  13:2
  13:8
email  29:16,19
embarrassed
  40:5 58:20
employees  6:23
  49:11
ended  26:10
english  20:12
ensure  53:1
entire  58:5
entitled  51:13
equifax  55:8,17
  55:18 56:18
  57:8 58:1,8
errata  66:11,13
  66:17
error  24:14

erupt  58:18
essentially
  19:16
estimated  12:12
evidence  2:3
exact  15:17 16:4
exactly  52:21
  64:4
exam  43:15
examination
  3:14,15 4:5,19
  63:15
examined  4:9
example  13:16
except  1:23
exhibit  3:16,17
  3:18,19,20
  22:15 23:21
  31:14 34:17
  36:1 37:3 48:21
  49:20
experian  55:8
  55:20 56:7,15
  56:20 57:20,23
  58:2
expires  65:21,22
explain  25:17
  45:6 48:11,14
explained  24:7
  52:16
extent  62:12

**f**

f  65:1
fact  40:19 41:7
  41:8 45:22

fails  66:19
fair  17:3 53:10
fairly  54:17
fall  59:17
familiar  6:5
  14:18 63:18
farm  14:2,4
farms  13:23
feature  39:19
february  10:13
  37:7 43:22 48:2
feel  9:14 39:14
  51:16 63:2
feeling  58:19
felt  52:2
fica  58:9
field  12:7
fighting  59:2
figure  21:13
file  8:7 51:5,6,6
  51:8 61:10,14
  63:2,13
filed  4:22 61:7,9
  62:1
files  19:18
final  49:17
finally  51:23
  60:19
find  17:9 43:17
  50:22 52:1
fine  4:17
finished  5:19
fires  12:6
first  4:9 9:11
  12:5 15:15,23

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

18:4,13,19
27:23 28:3,9
29:5,11 30:10
31:21 32:16,17
32:19 37:9
42:14 45:9,11
45:11,16 59:9
60:20 61:1
63:16
**fit** 26:21
**five** 7:13 12:1
13:7,8 20:15
40:14
**flashing** 9:8
**flip** 9:18
**florida** 3:9
44:18
**follow** 41:11
**following** 4:6
41:10
**follows** 4:10
**foregoing** 65:6
65:10 68:5
**fork** 7:11
**form** 1:23 52:6
52:6 65:9
**found** 43:19
47:10 55:19
**four** 7:16 20:14
24:21 27:22
32:15 54:21,23
56:2
**fourth** 22:5
**frame** 16:4

**franklin** 63:17
**free** 34:23
**frequently** 8:10
19:5 28:22
47:20
**friend** 13:10,19
**full** 12:7
**further** 1:21
65:13
**future** 53:1

**g**

**gagain** 3:8
**game** 52:22
**general** 10:10
10:12
**general's** 52:4
**generally** 5:15
15:22
**generated** 29:3
60:6
**getting** 15:6
21:6 23:9 32:13
**girl** 29:2
**give** 13:16 21:13
52:23
**given** 41:8 62:15
68:9
**go** 9:22 14:1
21:21 28:23
35:5 39:17
43:20 47:13
48:20 50:2,8
53:6,16
**going** 5:15,16
5:17 6:6 11:18

14:3 16:19 19:4
19:14 20:4 21:3
21:11,12 22:15
28:23 36:11
40:11,12,21
45:7 47:15 49:4
49:20 52:12
**golden** 3:8,8,14
4:19,20 9:19,23
10:18 21:16,20
21:22 51:13,17
51:22 52:23
53:3,16 55:1
63:3,7,9,12 64:6
**good** 4:20 13:6
18:16 21:18
40:16
**graduated** 10:2
10:3
**great** 60:16
**grew** 13:23
44:13
**grounds** 2:2
**group** 30:23
**guess** 27:10 42:6
60:6

**h**

**h** 67:3
**half** 24:21
**hand** 21:21
31:15
**handled** 49:13
52:8,9
**handwriting**
22:14,17,22

**happen** 5:15
**happened** 21:2
24:9
**happy** 40:15
**hard** 47:17
**hate** 39:13
**hated** 45:8
**hayden** 13:2,8
**healthcare**
10:20,22 11:5
**hear** 15:16
38:14,15 48:5
54:7,10 56:6,9
**heard** 6:17
15:13 28:9 31:7
40:18 42:22
54:15
**help** 20:13 23:9
52:2,11,18
61:22
**helped** 53:8
**helpful** 28:13
52:7
**helpless** 52:2
58:20
**hereto** 68:7
**high** 10:2
**hired** 12:7
**hold** 29:9 45:18
**home** 8:22
11:11 12:6,23
13:18 16:9,16
17:15 51:7
**honeycut** 7:10

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

**hope** 8:8 52:11
**hopeless** 52:3 58:20
**hospital** 12:22
**hour** 23:15 40:12
**hours** 20:11,23
**house** 9:2,7 13:22 17:6,12 61:11
**humiliated** 58:20
**husband** 5:8,8 52:9 59:4 61:6
**husband's** 19:7 26:7 39:3
**hysterical** 26:21

**i**

**i.c.** 1:7 66:4 67:1 68:1
**ic** 50:20
**idea** 28:6 29:5
**identify** 55:22
**illness** 12:2
**immediately** 18:6 20:1 59:8
**important** 33:14 39:2
**impose** 43:15
**impossible** 17:8
**impression** 42:3
**improve** 60:9
**including** 62:13
**indicate** 19:19

**indicated** 19:20 38:10 40:1 43:8 59:21
**indicates** 23:3
**industry** 10:20 10:23 11:5
**information** 50:13 55:21 56:6 59:20
**initial** 19:20 20:19 46:2,10
**inquiry** 47:17
**inspector** 12:8
**installation** 16:13
**installed** 17:5
**insurance** 5:9 11:6,7,10,16,20 12:3 61:21,22 62:2
**insureds** 12:16
**interested** 65:15
**interesting** 14:1
**internet** 8:22 16:9,16 17:16 17:19 35:5
**investigated** 55:18 56:12
**involved** 12:15
**issue** 45:13 59:5
**issued** 60:12 61:2
**issues** 14:10 61:19

**j**

**january** 13:12 47:23
**jefferson** 65:4
**job** 5:22 12:23
**jr** 3:5
**judgment** 34:6 34:6
**julia** 52:14
**july** 10:9 18:20
**june** 18:20 19:21,21 62:10

**k**

**karma** 29:2,14 29:15 30:3 39:19 40:6 41:6 46:1,5 47:13 56:20,23 57:22 57:22
**keep** 51:4
**kept** 62:21
**kin** 65:14
**kind** 6:12 10:5 12:6 62:18
**knew** 34:13,14 52:3
**know** 14:15,17 15:5,16 17:1 19:19 20:13 28:2 29:22 32:16 36:1 40:6 40:14 41:14,16 41:20 44:4,14 45:12,19 50:9 50:10 54:14

55:7 56:15,20 56:22 57:10,21 58:2 59:2,21 62:6
**kohl** 59:7
**kohl's** 59:22 60:20,22,23

**l**

**l** 1:14
**labeled** 22:17
**lady** 38:3,19 45:3,10 58:22 58:22
**land** 8:11,13,19
**language** 20:17
**late** 28:8
**law** 9:21
**lawsuit** 4:21 58:12
**lawyer** 51:23
**leading** 1:23 48:22 49:12
**learned** 40:19 43:23 45:21 46:8
**learning** 39:20
**leave** 61:15
**left** 12:18 13:20 31:15 36:17
**legal** 66:23
**legitimate** 56:12
**length** 45:13
**lengthy** 48:10 50:20

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

**letter** 3:19,21
  15:4,12,13,15
  15:23 16:1,2
  18:21,23 19:4
  21:3,6,9,15
  26:19 27:1,17
  27:18,23 28:2
  30:9,14,15,17
  30:18,18 31:5,6
  31:12,19,21
  32:10,11,12,17
  32:17,19 33:9
  33:13,17,20
  34:16,18 35:9
  35:16 37:9,12
  42:13,13 43:21
  48:1,8 49:3,19
  50:6,11,12,23
  51:1,3 53:5,7,20
  54:8,11,12,16
  55:21 56:7,10
  56:13,21 62:20
  63:19
**letters** 6:11
  14:19 15:6,19
  32:13,14,15
  47:23 48:3 51:9
  54:19 59:11
  62:13,22 63:1
**liberty** 11:8
**license** 55:22
  56:3
**licensed** 10:7
  12:19

**life** 15:2 61:20
  61:22 62:2
**liked** 14:3 52:15
**line** 8:12,13
  67:4,7,10,13,16
  67:19
**lines** 8:19
**listed** 41:15 47:8
**listen** 6:13
**listening** 7:3
**little** 29:2,7
  31:17 39:14
  44:18
**live** 7:14 8:21
  13:14 14:5
  44:18
**lived** 7:12,15,23
  17:10 32:3
**lives** 7:21
**llc** 1:7 3:4 66:4
  67:1 68:1
**local** 7:11
**locust** 7:11
**long** 6:6,20 7:12
  9:8 10:11,22
  11:20 12:13
  15:15 28:6,7
  35:9 36:20 46:4
  48:17 52:22
  54:14 59:18,19
**look** 22:5 24:11
  32:2 33:23 40:6
  47:14,18 48:13
**looked** 6:10
  40:5 47:12

**looking** 31:17
**looks** 57:1
**lost** 12:22 58:17
**lot** 14:2,5,6
**lots** 58:17,18
**lpn** 10:19

## m

**ma'am** 4:20 6:3
  7:5
**mad** 26:11
**made** 1:22 21:8
  29:18 36:2
  45:15 52:15
  68:5
**mail** 7:11 27:10
  32:5 34:6 50:3
  53:17
**mailed** 30:16,17
  51:9 53:11,15
  53:18
**mailing** 32:4,9
  55:23
**make** 2:1 5:18
  5:22 17:18 19:5
  23:12 24:4,13
  26:4 30:9 34:9
  34:21 36:4,6,9
  36:10,21 39:14
  42:12 43:14
  49:20 51:10
  56:4 57:18
  62:20 64:2
**makes** 35:4 42:6
  47:18

**making** 23:10
**marbella** 3:9
**march** 39:8,9
  50:19 62:8
**marked** 31:14
**math** 13:6
**mean** 11:13
  18:15 19:19
  20:2 27:21 35:4
  36:16 39:1
  57:15
**means** 11:14
  20:3 65:7
**medical** 61:9,12
**medicare** 14:12
**memory** 14:7,10
  43:15 51:19
**message** 29:7
  36:18
**middle** 33:17
**miles** 17:11
**miller** 1:19 3:12
  4:1 65:19
**mind** 4:14
**minute** 40:14
  43:11 48:18
**minutes** 45:5
**mistake** 20:3
**moment** 63:8
**money** 25:13
  27:7 49:4,9
**monique** 23:4
  23:10,13,17
  24:2,6 25:2 26:1
  26:9 27:6 28:8

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

28:17 36:3 49:8
**month** 17:15
18:4 19:3 20:7
21:1 37:8
**monthly** 11:16
18:19
**months** 15:18
19:3 26:19
27:23 28:10
48:4
**morning** 4:20
21:19
**mountain** 7:15
7:18
**moved** 7:16
13:9 17:11
**moving** 17:12
**mutual** 11:8

**n**

**n** 1:14 3:1,13
**name** 4:20,23
14:14 15:11
23:1 27:14 29:3
34:11 47:14
52:15,23 55:2
63:16
**named** 49:8
52:19
**necessary** 1:22
68:6
**need** 25:6 40:13
48:18
**needed** 29:23
46:6 55:21

**neighbor** 13:17
**neighbors** 13:19
**neither** 65:13
**net** 63:23
**never** 15:13
17:5 30:23 31:2
31:7 42:20,22
47:2 56:21 62:5
**new** 8:17 11:15
17:12,14
**nice** 45:4
**north** 3:5
**northern** 1:2
**notary** 1:19
68:13,19
**note** 24:1,16,16
66:10
**noted** 10:17
68:7
**notes** 21:8 23:18
24:12,13 25:5
25:19 36:2,4,7,9
36:21
**notice** 3:18
31:16 33:18
34:1,3,10 46:3
**notification**
46:5
**notified** 30:5
**notify** 34:2
**november** 18:12
21:2 24:6,20
26:16 27:1
48:22 49:3,7

**number** 5:16
8:10,11,11,13
9:9,9,11,12
34:19,23 35:1,6
47:7
**numbers** 8:3,6
42:18 47:18
52:13 58:6
**nurse** 10:7
12:19 13:3,4
**nursing** 10:3

**o**

**o** 1:14 32:6
**objections** 1:22
2:2
**obtain** 34:4,5
**obvious** 22:14
**occurred** 33:8
**occurring** 65:12
**october** 18:20
63:20
**offer** 3:20 37:4
**offered** 2:3
**offering** 37:14
**office** 7:11 52:5
**oh** 17:13 18:8
28:10 31:17
43:11 51:12
**okay** 5:23 6:1
10:15,16 17:21
18:1 20:3,22
21:18 22:3,19
23:3,23 26:22
26:23 27:22
30:2,8 31:14

32:1,6 33:23
37:1 40:9,12,23
41:18 42:6,23
43:3,17 49:19
49:21 53:10
55:9 57:6,18
63:3 64:5
**old** 9:15 10:15
**once** 5:6 33:15
56:5
**oneonta** 12:20
**ones** 13:21
22:16 56:1
**oops** 18:14
**opening** 48:6
**options** 52:1
**oral** 4:5
**ordered** 42:19
**organized** 62:19
**original** 21:21
34:11
**originals** 62:15
**outside** 22:8,10
**owe** 15:7 16:3
18:7 19:14 24:3
25:5,6,13,20,21
26:13 27:19
34:15 36:12,12
37:18 48:11,12
48:13 49:4,9,17
54:4
**owed** 24:18 27:6
49:16 55:19
**own** 12:10
47:19 58:15

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

| p | | | |
|---|---|---|---|
| **p**  1:14 3:1,1 32:6 | **penny's**  60:5 | 51:17,22 58:21 | **proceedings**  4:6 65:12 |
| **package**  16:8,22 17:13 | **people**  21:9 25:18 36:17 45:13,19,20 48:23 | **policies**  11:14 | **proceeds**  61:23 62:1 |
| **page**  67:4,7,10 67:13,16,19 | **period**  39:16 | **portion**  34:4 | **process**  40:10 40:13 |
| **paid**  46:7 53:17 61:23 62:2,3 | **person**  20:1 23:2 29:20 37:21 39:9 40:1 41:3 43:7 56:4,5 62:18 | **position**  26:12 | **produced**  63:12 65:9 |
| **paper**  42:16 | | **possession**  62:12 | **promise**  8:7 40:11 |
| **paragraph**  22:5 | | **possible**  5:22 | **property**  12:7 12:12 |
| **parents**  13:23 52:19 53:3 | **phone**  8:11,14 8:17,22 9:9,10 9:11,16,17,18 9:19,20 16:9,16 17:15,19 20:11 20:23 36:19 45:5 | **possibly**  44:10 44:11 48:4 | **protect**  47:3,5 |
| **parkinson's**  13:11 | | **post**  7:11 | **provide**  19:13 34:10 36:13 |
| **part**  29:9 32:22 33:17,20 58:11 59:16 | | **postage**  53:18 | **provided**  34:19 50:14 63:19 |
| **particular**  24:18 | | **power**  55:23 56:3 | **provider**  8:23 |
| **parties**  1:17 2:1 65:14 | **piece**  42:16 | **practical**  10:3,7 12:19 | **public**  1:20 68:19 |
| **passed**  5:9 13:12 61:6 | **pine**  7:15,18 | **precedes**  22:23 | **punch**  47:14 |
| | **place**  36:15 | **premiums**  11:16 | **punched**  29:17 |
| **password**  47:14 | **placed**  26:16,18 | **preparation**  6:7 | **purpose**  52:20 |
| **patience**  63:5 | **places**  60:2 | **prepare**  6:2,16 | **put**  10:19 13:18 16:9 30:5 41:14 41:15 42:14 53:8 |
| **pay**  18:21 19:15 22:6 24:3,19 25:6,7 36:11 37:17 45:7 | **plaintiff**  1:5 3:3 | **present**  58:21 | |
| | **plaza**  3:9 | **pretty**  19:9 25:2 37:10,11 39:2 48:5 52:21 62:19 | |
| | **pleaded**  26:5 | | q |
| | **please**  4:23 5:18 7:9 28:15 42:21 61:14 | **prior**  2:4 15:3,8 16:12 60:4,17 | **qbp**  12:5 |
| **penny**  29:3,7,20 30:3 39:19 41:6 42:7 46:1,3 56:23 | **pllc**  3:8 | **probably**  20:21 26:18 28:10,21 31:21 33:22 35:3,4,14,18,20 38:23 44:8 45:5 50:16 51:5 54:3 | **question**  5:19 31:23 33:12 |
| | **plus**  14:11 | | **questions**  1:23 2:1 5:16 6:9 29:4 63:4 65:8 |
| | **point**  10:19 26:16 36:14 39:19 40:10,13 43:9 44:2 48:22 | **problems**  14:7 | |
| | | **proceeding**  65:7 | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 1**

**quick** 4:16
**quickly** 54:17
**quit** 48:6
**quite** 28:21

**r**

**r** 3:1 65:1 67:3,3
**rain** 9:7
**rains** 9:5
**read** 4:13 6:4
    23:23 25:4,4
    33:10,11,13,14
    33:22 37:14
    66:9 68:5
**reading** 22:6
    33:20 48:8 52:6
**really** 14:3
    20:13 24:22
    41:8
**reapply** 60:22
    60:23
**reason** 25:20
    40:23 66:11
    67:6,9,12,15,18
    67:21
**rebuild** 19:7
    26:6 28:16 39:3
**recall** 15:20,22
    27:16 36:6
    37:23 44:22
    45:1 55:17
**recalled** 27:14
**receipt** 66:18
**receive** 7:10
    15:19 18:2,7
    19:15 24:14

27:2,20 30:22
32:4
**received** 6:5
    18:4,10,11
    27:23 28:3,7
    30:17 35:9
    42:21 45:15
    60:3
**receiving** 32:11
    34:3,10 37:12
    48:2
**recently** 6:4
**recess** 63:10
**recognize** 20:3
**recollection**
    35:8,19
**recommend**
    52:11
**recommendati...**
    29:18
**record** 4:23
    10:14 25:18
    34:21 47:19
    51:15 62:4 64:3
**recording** 38:19
**recordings** 6:13
    6:14,17,22 7:3
    38:9,15
**reduce** 37:14
**refer** 21:3
**referenced** 66:6
**referred** 8:21
    16:15 22:8 23:8
**reflect** 10:14

**regarding** 26:3
    33:4 62:14
**regular** 12:16
**relate** 20:16
**related** 62:13
**relation** 5:7
    50:4
**remain** 62:4
**remained** 50:21
**remember** 7:2
    9:15 14:14
    15:11 16:4
    17:23 23:6
    24:15,21 27:13
    29:15 32:11,13
    33:20,23 37:11
    37:19 38:21
    39:18 43:17
    44:6 45:11,14
    46:13,20,21
    48:2
**remlap** 7:20
**removed** 56:15
    57:12,13 59:8
    59:12 60:13
**removing** 60:4
**repairs** 12:6
**report** 22:11
    29:1,8,13,23
    30:6 32:21 38:2
    38:3,5,19 39:6
    39:16 40:2,8
    41:3,10,13,16
    42:2 43:9,20
    44:1 46:5,7,12

46:15,16,18
47:7,9,15,18
50:21 56:16,18
57:1,11,17,20
57:21 58:3,5,6
59:3,9,12,20
60:5 62:7
**reported** 33:2
    39:21 40:20
    41:7,17 42:9
    45:22
**reporter** 3:12
    4:1,12 5:17
**reporter's** 5:22
**reporting** 37:20
    39:11 44:2
    45:11 46:9
    56:19 57:7 58:6
**reports** 42:2
**represent** 4:21
    39:7
**representatives**
    24:10
**represents**
    65:10
**request** 34:9
**required** 10:5
    68:13
**reserve** 4:13
**reside** 7:5,6
**residence** 8:20
    13:9
**resolve** 20:23
    50:22

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 1**

**resolved** 20:20
24:17
**respect** 57:1
**respective** 1:17
**respond** 54:18
56:7
**responded**
54:17
**response** 19:17
35:16 54:7
55:12,13 56:10
56:21
**responses** 55:9
**result** 58:12
65:15
**retained** 63:2
**return** 66:13,17
**returned** 16:1
**review** 6:8 51:9
53:11 66:7
**reviewed** 38:8
53:9
**richard** 3:5
**right** 4:13 5:12
7:21 10:20 11:2
13:18 17:6 20:4
21:4 22:1,4,12
22:17,22 23:4
23:17 25:11,14
26:10,12,13,17
27:3,11 28:4
29:14 30:11
31:2,9,9,16,19
32:6,11 33:9
34:16 35:4,8

36:15 37:3,6,9
39:7 40:20,21
41:3,22 42:2,9
43:5 47:4,10,11
47:22 49:1,5,9
49:11,13 50:2
51:17,21,23
53:19,21 55:1
55:15 56:4,5,22
59:18 61:19
**road** 7:10,15,18
**room** 9:14
**roughly** 63:21
**rural** 13:14,15
16:15

**s**

**s** 1:14 3:1 9:1
67:3
**sales** 44:8 58:22
**sat** 8:21 9:1
16:16 17:22
**satellite** 8:14,17
8:22 9:1,2 16:16
16:20 17:22
**savings** 11:8
**saw** 33:1
**saying** 14:20
20:14 29:7
38:21 46:20,21
49:4 54:12
**says** 19:4 22:4,4
22:6,10 33:18
34:2,8,13 37:4
50:3,3

**scaz** 3:8
**school** 9:21 10:2
10:3 13:2,4
**schools** 12:20
**score** 57:8 58:9
60:10
**scored** 14:11
**screaming**
26:21
**screen** 21:12
31:12
**scrolled** 34:22
**seals** 3:4,4,15
4:13 9:17,22
10:17 21:14,20
51:10,15,21
52:13,17,19,21
53:2,14 54:22
63:7,11,15 64:5
66:1
**search** 35:5
**seasons** 44:17
44:19
**second** 34:1
48:1
**secret** 8:15
**security** 55:23
**see** 13:20,21
21:16,16,17
22:4 24:16
25:19 28:12,22
31:11,11,15,18
33:17 34:8
35:14 37:1,4
48:13,19 49:21

50:4,11,12
51:23 52:6 56:3
56:17,19 57:16
57:19 62:9
**seeking** 51:14
**seem** 62:18
**seemed** 41:8
45:7 48:12
**seems** 37:15
41:5 46:23 47:2
48:16 49:15,17
**seen** 31:19
**sees** 24:15
**send** 4:14 18:15
49:4 51:1 52:5
52:12 54:19,20
**sense** 35:4 42:6
**sent** 6:11 15:15
16:1 18:16,23
20:6 21:9 27:17
29:16 30:15
32:10 42:13,17
48:7,8 50:6,9,10
50:14,23 51:3
53:17,19,20
54:12,14,15
55:3,5,7 56:1,1
56:5,8 62:20,23
66:14
**sentence** 34:1
**september**
18:20 28:8
**service** 8:20 9:5
16:19,20 17:5,9
18:7,8 19:13,15

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

24:5,14 30:21 36:12 42:19,21 47:2 63:17

**serviced**  11:14 12:11

**services**  17:15

**settlement**  3:20 37:4,13

**several**  5:13 26:18 35:18 45:5 48:23

**share**  21:12

**sharon**  1:4,11 1:18 4:4,8 5:1 66:4,5 67:1,2,24 68:1,2,4,12

**sheet**  66:11

**shingles**  58:18

**shortly**  47:12

**show**  36:23 42:4 49:19,22 57:23 58:5

**showed**  36:1 47:23

**showing**  41:19 58:4

**sick**  12:1 13:19 24:5

**side**  31:15

**sight**  13:18

**sign**  4:14 16:17 66:12

**signature**  49:22 65:18

**signed**  29:14 65:16 66:20

**signing**  29:15

**silly**  33:12

**sir**  5:1 8:2,16 12:17 13:15 14:8,11,16 15:12 16:1,21 17:2,7 18:4,11 19:11,23 20:5 20:21 21:5,8,17 22:2,9,18 23:5,8 23:14,16,22 24:11 25:12,15 25:17 26:4,14 26:18 27:12,16 28:5 30:7,12,14 30:20 31:4,8,10 31:13,21 32:8 33:19 34:19 35:7,11 36:6,16 37:2,5,10,13,22 38:7 39:5,15 41:11 42:10,16 43:2,11,18 44:3 44:21 45:3 46:1 46:13 49:2,6,14 50:1,5,7,10,16 51:2,12 53:13 53:22 54:1,3,9 55:4,6,8,11,16 56:11,14,17 57:12,14,21 58:4,14,17 60:1 61:4 62:8,17

**sit**  40:11

**situation**  52:10 52:16

**six**  13:5

**sleep**  58:17

**smaller**  49:21

**social**  55:23 56:2

**solutions**  66:23

**somebody**  25:3 48:17 52:13

**sorry**  11:8 16:14 18:8,14 24:17 27:13,21 31:17 55:12

**sort**  14:9 16:22 16:23 42:15 43:15

**sounds**  33:12 51:21 63:18

**southeast**  66:15

**space**  14:2,5,6

**speak**  20:12 34:20

**speaking**  23:2 59:11

**specific**  35:19 57:10

**specifically**  33:5 37:21 46:17

**spoke**  23:17 24:2,6,12 36:3 43:7 49:8

**spoken**  24:9

**st**  12:21,22

**standing**  22:12

**start**  5:19

**started**  11:4,15 29:17 58:23

**starts**  9:8

**state**  4:1,23 22:14 65:3

**states**  1:1

**stating**  55:21

**status**  28:12,22

**stenographic**  65:7

**stipulated**  1:16 1:21

**stipulations**  4:12,16

**stopped**  48:8 50:18

**storms**  12:6

**story**  24:7 45:4

**strange**  41:8

**straw**  49:17

**street**  13:20

**subscribed**  68:14

**substances**  19:8

**success**  53:1

**suggestion**  60:5

**summer**  44:17 44:20,20

**supervision**  65:10

**supervisor**  25:3

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

supposed  16:21
16:23 25:18
sure  5:18 15:17
17:2,3,18 19:6
23:12 26:4
29:10 30:9 33:4
33:6,16,16
34:20 38:6,18
40:3,22 42:12
44:3,12 45:9
46:3 47:20 48:7
51:10 56:4
57:19 61:9
62:20 63:1,7
64:2
surgery  61:13
surprising
25:16
survive  61:13
switch  31:11
sworn  4:9 68:14
syatem  66:4
67:1 68:1
sympathy  45:8
system  1:7 4:21
6:23 14:14,21
15:1,3,8,16,19
16:5 28:18 30:5
32:13,14 33:1
33:10 34:17
35:10,16 36:4
36:15 37:20
38:1,1,4 39:11
39:20 40:1,2,18
40:19 41:2,3,6,9

42:1,4,4,8,23
43:8,8 45:1,2,22
46:9,11 48:1,3
50:18 51:1,3
53:20 55:5 56:9
56:13 58:13
62:14,23
systems  6:9 9:1
28:1 29:6,23
32:21 36:22
40:7 41:14,15
41:17 46:15,18
47:21 50:21
54:16

## t

t  1:14,14 3:8 9:1
65:1,1 67:3,3
tablet  42:16
take  4:22 5:17
18:9 40:13
taken  1:18 5:3
60:7 63:10 65:7
talk  29:21 34:17
52:3
talked  20:21
21:9 36:8 39:18
43:10 44:22
45:12,12,19
46:23 51:11
52:3
talking  21:3
29:18 32:7
tampa  3:9
tears  58:18

telephone  8:3,6
8:20 28:17,19
36:9
tell  9:7 24:9,16
25:20 33:7 57:6
58:15
telling  16:2
18:21 29:16
40:17 41:9
48:10
ten  11:1,8,22
12:5 59:3
terms  12:21
13:2 17:18 33:2
testified  4:10
41:1 42:12
55:14
testimony  17:4
53:19 54:22
66:9,18 68:8
thank  40:16
43:18 63:6
thereof  34:4
thereto  2:4
thing  6:12 10:5
12:6 14:1 15:4,5
29:3 39:2 41:12
42:8 43:13 54:4
things  14:3
think  14:6 16:11
17:17 18:5,18
19:21 21:10
23:4 25:2 28:19
29:8,20,20
32:17,20 34:1

35:13 36:14,18
36:23 37:7,14
38:8 41:22
43:11,22,23
44:19 45:16,17
45:17 48:18,20
50:19 51:18
52:19 58:9
59:23 61:13,20
62:8,9 63:3
thinking  20:20
35:20 50:19
thoroughly  33:7
thought  20:5,22
59:4 60:8
three  12:20,20
17:15 22:5,16
27:22 33:14
54:23 61:16
time  2:2,3 8:1
8:20 12:7 15:17
16:4 19:9,16,18
20:10,21,22
24:12 25:13
28:15 32:3
37:17 43:21
44:14 45:21
47:13 49:15
50:17 53:23
56:23 57:17
59:7 60:7,11,14
60:15,20 61:18
63:22 65:12
66:19

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1

**timeframe** 66:8
**times** 5:5 12:10
  20:15 32:15
  33:5,14 35:18
**today** 4:22 5:15
  6:3 24:22 31:20
  38:10,15,16
  46:20,23
**together** 42:14
  53:8
**told** 18:6 24:8
  24:18 27:6,14
  27:18 28:13,23
  37:17 38:1,3
  39:5 41:2 42:19
  44:13 45:4
  46:14,17 49:9
  52:10 53:13,14
**toll** 34:23
**took** 13:11 20:2
  56:20 59:17
  62:1
**top** 22:19 50:2,4
**total** 12:14 13:5
  22:6
**totaled** 61:10
**tough** 49:15
**towards** 32:2
  33:18
**town** 7:19,20
**trans** 1:7 50:3
  50:23 54:7,10
  55:3,13 56:18
  57:8,23 58:8
  66:4 67:1 68:1

**transcript** 65:9
  65:11 66:6,20
  68:5,8
**transfer** 23:13
**traveling** 36:8
  36:19,21 45:3
**trial** 2:2
**tricky** 21:11
**tried** 25:17
  47:10 48:11,14
**true** 9:6,6 65:11
  68:8
**truth** 48:19
**try** 5:18 21:12
**trying** 14:20
  15:10 19:6
  20:11,23 21:12
  26:6 28:15
  36:10 39:3,16
  43:15,17 45:6
  47:3,5,16 50:22
  54:5,5
**turn** 19:4 26:5
**turndown** 46:2
**turned** 18:22
  25:7 28:14 46:4
**tv** 17:19
**twice** 5:8 59:6,7
  59:22,23
**two** 8:5,6 9:14
  10:9 13:2 17:22
  20:11,23 21:9
  22:5 33:14
  44:17,19 45:12
  45:19,19 47:23

52:14 56:17,19
  57:23 58:6,8
  61:6 62:22
**type** 29:21 61:7

## u

**u** 1:14 16:8,14
  16:19,21 17:5,9
  17:10 34:14
  40:7 41:12
  63:23
**ultimately** 49:8
**under** 31:16
  34:1 37:6 65:9
**underneath**
  23:18
**understand**
  5:14 17:4 18:13
  20:9 21:22
  23:12 24:4 25:9
  26:8,15 27:9
  29:12 30:2,8,9
  36:11 39:1 40:9
  40:17 42:12
  43:5,7 45:21
  46:22 47:22,22
  48:20 53:5 55:5
  57:15,19 59:1
**understanding**
  14:21 39:10
  50:13
**union** 1:7 50:3
  50:23 54:7,10
  55:3,13 56:18
  57:8 58:1,8 66:4
  67:1 68:1

**unions** 56:19
**united** 1:1
**update** 19:18
  25:18 56:23
**upset** 26:11
  35:13 47:1
  58:19 59:1
**upsetting** 48:9
**use** 8:8,10 10:19
  39:13
**used** 66:20
**user** 47:14
**usual** 4:12,16
**usually** 33:13
  35:14

## v

**v** 9:1 66:4 67:1
  68:1
**validity** 34:3
**values** 12:12
**various** 48:23
**vehicle** 36:8
**verbally** 30:14
**verification**
  34:5,7
**verified** 54:13
  55:15
**verify** 42:21
  66:9
**veritext** 66:14
  66:23
**veritext.com.**
  66:15
**verse** 16:8,14,19
  16:21 17:5,9,10

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 1**

**[verse - zoom]**                                                                    Page 85

34:14 40:7
41:12 63:23
**vincent's**  12:21
12:22
**volunteered**
46:14
**vs**  1:6

### w

**w**  3:4 66:1
**wait**  43:11
48:18
**waited**  23:15
**want**  7:8 10:14
17:17 23:12
24:8 42:12
43:16 57:18
61:14
**wanted**  39:17
43:13 56:4
62:20 64:2
**way**  21:2 24:8
40:10 48:21
50:22 53:7 60:9
**week**  10:10
**weeks**  6:21
35:12 38:18
54:15 61:6
**went**  10:19 11:6
11:18 12:2 24:2
33:6 40:5
**whitney**  3:4
52:15,19 66:1,2
**whoa**  52:17,17
**winter**  44:16

**wiped**  15:5
**wisconsin**  13:23
44:13,15,17
**witness**  4:5
51:12 63:6 66:8
66:10,12,19
**woman**  41:9,21
41:22 46:11
**word**  39:13
**words**  58:15
**work**  10:8,9,22
11:6,20 12:2,13
12:18 30:1 46:6
**worked**  11:11
12:11,19,21
13:2
**working**  10:11
11:4
**world**  45:8
**write**  17:14
34:12
**writing**  34:2,9
**wrong**  51:20
**wrote**  11:15
15:4,13 23:18
27:18 30:14
31:6 32:15
42:16

### x

**x**  3:13

### y

**yeah**  9:6 14:1
25:1 35:1 37:11
52:12,22 55:3

58:11 60:16
**year**  44:7,14
**years**  5:13 7:13
7:16 9:12 11:1,9
11:22 12:1,5,12
12:14,20 13:5
13:10 14:19
24:21 59:3,10
**yesterday**  57:3
57:4,6

### z

**zoom**  1:11,20
4:3

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT EXHIBIT 1**

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1**



**EXHIBIT 1-A**

# System

### ACCOUNT SUMMARY

| | |
|---|---|
| Creditor: | ATT U-Verse |
| Account No.: | |
| I.C. System Reference No.: | |

**BALANCE DUE:** $151.33

# COLLECTION NOTICE

1/8/2021

Sharon Dorsey:

Your delinquent account has been turned over to this collection agency. ATT U-Verse is both the original and current creditor to whom this debt is owed.

The account information is scheduled to be reported to the national credit reporting agencies in your creditor's name. You have the right to inspect your credit file in accordance with federal law. I.C. System will not submit the account information to the national credit reporting agencies until the expiration of the time period described in the notice below.

Please tear off the bottom portion of this letter and return it with your payment.

If you will be receiving a tax refund and would like to use it to pay your account, please call us to make payment arrangements.

We are a debt collector attempting to collect a debt and any information obtained will be used for that purpose.

NOTICE

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, we will assume this debt is valid. If you notify us in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, we will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you make a request in writing within 30 days after receiving this notice we will provide you with the name and address of the original creditor, if different from the current creditor.

If you feel you are or have been a victim of Theft of Identity, please call AT&T directly.

This does not contain a complete list of the rights consumers have under Federal, State, or Local laws.

I.C. System, Inc.|444 Highway 96 East, PO Box 64378, St. Paul MN 55164-0378

149011-T01-510-15613764T-System-47388

**5 YOU HAVE OPTIONS**

- 🖥️ For questions or payment please go to: https://www.icsystem.com/consumer
- ✉️ Mail check or money order payable to I.C. System, Inc. with coupon below
- ☎️ Call Toll-Free at 888-312-3595

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

P.O. Box 64437
St. Paul, MN 55164-0437
Electronic Service Requested

**BALANCE DUE:** $151.33

**I.C. System Reference No.:**

☐ Address Changed?
STREET _____
CITY _____ STATE _____ ZIP _____
Billing Phone Number _____

Pay Online at
https://www.icsystem.com/consumer

MAKE CHECK OR MONEY ORDER PAYABLE TO:

ORSEY

I.C. SYSTEM, INC.
PO BOX 64378
SAINT PAUL MN 55164-0378

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 1-A**

026800139 0101

EXHIBIT 2

VIA CERTIFIED MAIL

TransUnion Consumer Relations
P. O. Box 2000
Chester, PA 19022-2000

To Whom it May Concern:

My name is Sharon Dorsey. My address is ████████████, Remlap, Alabama 35133.
My birthdate is ███████ The last four digits of my social security number are ███ I am
enclosing a copy of my Alabama drivers license so that you know it is me writing you about this
issue. I am writing because there is false or inaccurate information that is being reported on my
credit report that I want investigated and removed please.

When I moved to my current address in 2018, I wanted to have AT&T service for phone and
internet. I was told it was $101.00 per month for AT&T Uverse bundled service so I applied. After
I applied for that service, I learned that AT&T Uverse service was not available at my address. To
this day it is still not available and I have not had that service at my current home. I got bills for
AT&T Uverse (even though it was not available to me at my address) which I did not owe since I
couldn't even get the service and now a collection company called IC Systems is reporting on my
credit that I owe ATT Uverse $151.00. I do not owe this money as I have never had this service and
this service was never available for me to have at my home. This debt that is being reported by IC
Systems is false and inaccurate.

This false information that IC Systems is reporting has caused me to get denied for a Kohl's
credit card and a Belk card. The fact that this company is reporting a debt that is false and is hurting
my credit when I do not owe it has caused me much stress and anxiety. Please get this off my credit.

It is my understanding that you are required by the Fair Credit Reporting Act to investigate
the entry on my credit report from IC Systems about the Uverse debt and respond to me after you
investigate. I believe that AT&T will tell you that I cannot even get Uverse service at my house and
so there's no way I owe money for a service I cannot even get. Please mail any response to my letter
to my mailing address:

Sharon Dorsey
P.O. Box 228
Locust Fork, AL 35097

If you need more information from me. You can call me at ████████████ or write me and
I will try my best to give you whatever information you need. If this account is not being reported
on my credit report, please let me know that as well as I am concerned that this account is being
reported even though I don't owe this debt and never have owed the debt.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1-B

I look forward to hearing back from you.

Sincerely,

Sharon Dorsey

Sharon Dorsey

Enclosure

**KC System®**

**ACCOUNT SUMMARY**

| | |
|---|---|
| **Creditor:** | ATT U-Verse |
| **Account No.:** | |
| **I.C. System Reference No.:** | |

| **BALANCE DUE:** | **$151.33** |
|---|---|

# SETTLEMENT OFFER

2/11/2021

Sharon Dorsey:

Would you be willing to pay 5█% of the BALANCE DUE above?

To resolve the BALANCE DUE indicated above, our office will accept a reduced payment amount of $75.67.

For more information about your account or to make payment, please visit https://www.icsystem.com/consumer. You may also accept this offer by calling 888-312-3█95 or sending payment by mail.

If you will be receiving a tax refund and would like to use it to pay your account, please call us to make payment arrangements.

We are a debt collector attempting to collect a debt and any information obtained will be used for that purpose.

This does not contain a complete list of the rights consumers have under Federal, State, or Local laws.

I.C. System, Inc. 444 Highway 96 East, P█ Box 64378, St. Paul MN 55164-0378

149011-T01-278-1553045-5-System-35925

**YOU HAVE OPTIONS**

- For questions or payment please go to: https://www.icsystem.com/consumer
- Mail check or money order payable to I.C. System, Inc. with coupon below
- Call Toll-Free at 888-312-3595

---

P.O. Box 64437
St. Paul, MN 55164-0437
Electronic Service Requested

☐ Address Changed?
STREET _____
CITY _____ STATE _____ ZIP _____
Billing Phone Number _____

SHAR█N D█RSEY


| **BALANCE DUE:** | **$151.33** |
|---|---|

**I.C. System Reference No.:**

- Pay Online at
  https://www.icsystem.com/consumer
- MAKE CHECK OR MONEY ORDER PAYABLE TO:

I.C. SYSTEM, INC.
PO BOX 64378
SAINT PAUL MN 55164-0378

02758000001513323566026800139010101

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1-C**



**AT&T**

SHARON DORSEY

November 08, 2018

RE: ▇▇▇▇

Dear SHARON DORSEY:

We recently sent you a final bill for your closed AT&T account. Perhaps you have overlooked or misplaced this bill as we are showing a balance due of $151.33. If you have not made your payment, please do so immediately or call us to make satisfactory payment arrangements.

You can make a payment by going online at att.com/pay, using the my AT&T app (where available) on your smartphone, or also using our Interactive Voice Response system at 800-288-2020. Payments made with an AT&T representative may be subject to a $5.00 convenience fee.

If you have equipment with a monthly fee, a letter is sent to provide details for how to return it to an authorized location. You may be billed for equipment not returned within 21 days of disconnection.

If you do not pay the total balance by the DUE BY date, your account may be referred to an outside collection agency. The outside collection agency may report your debt to credit bureaus, which may affect your credit standing. You may also be required to pay collection agency fees and attorney fees, as permitted by law. If you have any questions, please contact us at 800-288-2020.

We look forward to doing business with you in the future.

Thank you for choosing AT&T.

FBLTR2U99C

**AMOUNT DUE: $151.33**

SHARON DORSEY

Account Number ▇▇▇▇▇
Please include account number on your check.

Make Checks Payable to:

AT&T
PO BOX 5014
CAROL STREAM IL 60197-5014

7088.001.000842.01.01.0000000 NNNNNNNY 001683.001683

4000405100228565608500000000015343000000015133000006

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 1-D**

565125

 installs

| Delivery Appointment Details |
| Delivery Date*: 6 / 9 / 18 @ 8:00 am |
| * Pickup: Clubs, product should be staged for pickup the morning on this date |

# Member Information For Delivery

Note: If a Member is not present for delivery, other designated recipients MUST be 18 years of age or older.

Delivery Service Provider __Installs Inc, LLC__      Phone Number __877-758-4346 option 7__

Date _6/23/18_      Register # _38_      Transaction # _1797_

Member Name _Sharon Dorsey_      Membership # ████████

Club # _4817_      Email _N/A_

Member Address ████████████████████

Phone Number ████████      Cell Phone Number ████████

Delivery Instructions:

Haul-Away ☐
*(check box if required)*

Merchandise Description:

Brand _LG_

Item # _18010980924_

Model # _____
*(please attach copy of receipt)*

**PROMOTIONAL SERVICES:**
Is this part of a current promotion:

| Warranty Bundle | ☐ | Warranty Item # _129017_ |
| Basic Mount Bundle | | Mattress ☐ |
| Premium Mount Bundle | ☑ | Other ☐ |
| 4K TV Bundle | ☐ | *(please specify)* |

Limitation of Liability: By signing this form, you understand that the company or individual delivering and setting up or installing the products you have purchased at Sam's Club® is an independent contractor and is not owned or operated by Sam's Club. Sam's Club is not responsible for the actions of the company delivering and setting up or installing your products, including, but not limited to, damage caused to your products or your property as a result of the company's delivery, set up or installation services. Members are not required to use the delivery service provider referred to Sam's Club and may also choose to pick up the purchased items themselves. Redelivery fees will apply to any returned product.

_Sharon Dorsey_

Member Signature                       Checkout Supervisor (Printed)

**This section to be used by Service Provider and Club Manager during product pickup processing.**

Service Company                              Phone Number

Service Provider Name (Printed)                  Service Provider Signature

Club Member Signature

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
EXHIBIT 1-D**

White's Motion for Summary Judgment - Exhibit D

Reorder # 99027C13P