FILED

2024 May-01  PM 01:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHARON DORSEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  2:22-cv-1489-ACA** |
| | ) | |
| **TRANS UNION, LLC, _et al._,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

In 2018, Ms. Dorsey opened an AT&T U-verse account with bundled services. A few days later, AT&T notified Ms. Dorsey that because she lived in a rural area, AT&T could not provide her all the services she had signed up for. For four months, AT&T continued to send Ms. Dorsey a bill for the services she had not received, and each month, Ms. Dorsey called AT&T and reminded its representatives that she had not received those services. The first three times, AT&T representatives told Ms. Dorsey that AT&T had erroneously sent her the bill, but the final time, an AT&T representative told Ms. Dorsey that she still owed the money. After that final call, AT&T stopped sending Ms. Dorsey bills.

In 2020, AT&T referred Ms. Dorsey's unpaid bill to Defendant IC System, Inc. ("ICS"). Under ICS's contract with AT&T, AT&T refers debts to ICS that "are validly due and owing." AT&T also has a contractual obligation to verify the validity

of the debt in the event of a consumer dispute and keep ICS updated regarding the debt's validity. In return, ICS handles the collection process.

ICS reported Ms. Dorsey's debt to credit bureaus such as former defendant Trans Union, LLC ("Trans Union"). When ICS tried to collect on Ms. Dorsey's alleged debt, Ms. Dorsey informed ICS's representatives that she disputed owing AT&T money, and ICS's system automatically reported the dispute to various credit bureaus. Ms. Dorsey also disputed ICS's credit reporting directly to Trans Union on two occasions. For all three disputes, ICS confirmed only that Ms. Dorsey was the person AT&T said owed money and that the amount of money was correct, but ICS never asked AT&T whether Ms. Dorsey had a contract with AT&T or whether she had received those services. ICS then verified to Trans Union that the information about Ms. Dorsey's debt was correct.

Ms. Dorsey filed her complaint alleging that ICS violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b), ("Count Two") and the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. §§ 1692d, 1692e, ("Count Three"). (Doc. 25 ¶¶ 37–44).[1] ICS moves for summary judgment as to both claims. (Doc. 38).

Regarding Count Two, the court rejects most of ICS's arguments. But a recent Eleventh Circuit opinion affects the court's analysis of one of ICS's arguments. *See*

---

[1] Ms. Dorsey asserted Count One against Trans Union. (*See* doc. 25 ¶¶ 32–36). The court dismissed that claim on Ms. Dorsey and Trans Union's joint motion. (*See* docs. 29, 32).

*Holden v. Holiday Inn Club Vacations Inc.*, No. 22-11014, ____ F.4th ____, 2024 WL 1759143 (Apr. 24, 2024). The court therefore **WILL RESERVE RULING** on ICS's motion as to that aspect of Count Two and **DIRECTS** the parties to provide supplemental briefing as set out in this memorandum opinion. *See infra* at 13–14.

In Count Three, Ms. Dorsey asserts that ICS violated the FDCPA by: (1) attempting to collect a debt that she did not owe; (2) calling her to attempt debt collection after receiving notice that she disputed the debt; and (3) reporting and verifying the debt to Trans Union. ICS has carried its burden as to the first aspect of Ms. Dorsey's FDCPA claim, so the court **WILL GRANT** ICS's motion and **WILL ENTER SUMMARY JUDGMENT** in ICS's favor as to that aspect of her claim. ICS has not carried its burden as to the second aspect of Ms. Dorsey's claim, so the court **WILL DENY** ICS's motion on that ground. As to the third aspect of Ms. Dorsey's claim, the court **WILL RESERVE RULING** because that aspect of her claim implicates ICS's obligations under the FCRA.

## I.    BACKGROUND

When approaching a motion for summary judgment, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022) (quotation marks omitted). Where the parties have presented evidence creating a dispute of fact,

the court's description of the facts adopts the version most favorable to the nonmovant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

Around June 2018, Ms. Dorsey opened an AT&T U-verse account with "bundled" phone, internet, and DirecTV services. (Doc. 47-1 at 5; doc. 47-2 at 50). A few days later, she received a call from an AT&T representative that the internet and phone services were unavailable because she lived in a rural area. (*See* doc. 47-1 at 5). The parties do not appear to dispute that Ms. Dorsey did not receive internet or phone services from AT&T. (*See id*. at 5–6; *see also* doc. 47-4 at 14, 16); Fed. R. Civ. P. 56(c)(1) (requiring a party that asserts a fact is disputed to support that assertion with materials in the record or a showing that the materials do not establish the absence of a dispute).

Although Ms. Dorsey did not receive these services, AT&T billed her for internet and phone services each month. (Doc. 47-1 at 6). And each month, Ms. Dorsey called AT&T to remind them that she did not owe them for the services she did not receive. (*Id*.). Each time she called AT&T, the representatives she spoke with apologized and indicated that AT&T inadvertently sent the bill to her. (*Id*.).

In November 2018, Ms. Dorsey received a bill from AT&T which stated that AT&T would refer her account to an outside collection agency who might report her debt to credit bureaus if she did not pay the full balance of her bill. (*Id*. at 42). Ms. Dorsey called AT&T regarding her bill, but this time, the representative's response was different. (Doc. 47-1 at 7–8). Ms. Dorsey testified that the AT&T representative told her that she had an outstanding balance on her bill and she would have to pay that amount "or [her account] would be turned over to a collection company." (*Id*. at 7). Ms. Dorsey did not pay the outstanding balance and did not receive another bill from AT&T. (*Id*.).

In December 2020, AT&T referred Ms. Dorsey's account to ICS. (*See* doc. 47-2 at 23). ICS is a debt collection agency; it does not purchase debts but instead collects the unpaid accounts for third parties. (*See* doc. 47-4 at 3). As part of AT&T and ICS's contract, AT&T refers debts to ICS that are "validly due and owing." (*Id*. at 14, 28).[2] And when ICS communicates a consumer dispute to AT&T, AT&T

---

[2] ICS has not provided the court with a copy of this contract. Any testimony regarding the *terms* of that contract is inadmissible because the best evidence of the contract's terms is the contract itself. *See Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 830 (11th Cir. 2004). Generally, inadmissible evidence "cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (quotation marks omitted). But Ms. Dorsey has not objected to this evidence (*see* doc. 49), and in the absence of an objection, such evidence "could and, if material, should be factored into a summary judgment decision," *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987). So the court accepts that this contract exists and that its terms are what ICS represents them to be.

remains obligated "to verify the validity of the debt and to keep [ICS] updated" on the debt's validity. (*Id*. at 28; *see also id*. at 26).

The next month, ICS sent Ms. Dorsey a letter, notifying her that AT&T had referred her account to ICS for collections. (*See* doc. 47-1 at 38). The letter further notified Ms. Dorsey that she could dispute the validity of her debt in writing within thirty days of receiving the letter. (*See id*.). Ms. Dorsey did not notify ICS in writing that she disputed the debt. (*Id*. at 10).

In March 2021, Ms. Dorsey called ICS and notified an ICS representative that she disputed owing a debt to AT&T. (*See* doc. 47-2 at 15; *see also* doc. 47-3 at 21–32; doc. 47-3 at 4 ¶ 13). The ICS representative updated Ms. Dorsey's account records to reflect that Ms. Dorsey disputed the debt. (Doc. 47-3 at 4 ¶ 13). ICS's system automatically communicated the dispute to various credit reporting agencies and to AT&T. (*See id*.; doc. 39-2 at 5 ¶ 19). But because Ms. Dorsey's dispute was verbal and not in writing, ICS did not require a response from AT&T about the dispute. (*See* doc. 39-2 at 15) ("Answer Not Required"); (doc. 47-4 at 14–15). Instead, ICS assumed, based on AT&T contract to report only "validly due and owing" debts, that the lack of response meant that Ms. Dorsey did owe the debt. (Doc. 47-4 at 14).

In October 2021, ICS received a notification that Ms. Dorsey had filed a dispute with Trans Union about ICS's credit reporting. (Doc. 47-3 at 5 ¶ 15; *accord*

doc. 47-2 at 14; doc. 47-4 at 16). When a consumer disputes ICS's reporting to a credit reporting agency like Trans Union, ICS's policy is to "recommunicate" the dispute to the original creditor and see if the creditor updates the file with a balance adjustment or payment information. (Doc. 47-4 at 18; *see also id*. at 22). Consistent with this policy, ICS sent Ms. Dorsey's dispute to AT&T. (*See id*. at 14–16, 18, 26). Because AT&T did not recall the debt, ICS determined that its credit reporting was accurate and that Ms. Dorsey had an outstanding balance with AT&T. (Doc. 47-3 ¶¶ 15–16).

A month later, an ICS representative called Ms. Dorsey. (Doc. 47-2 at 6 ¶ 25; *see also id*. at 49–61). Ms. Dorsey reiterated that she would not pay the outstanding balance on her account because she did not owe AT&T any money. (*Id*. at 52). ICS updated Ms. Dorsey's file to reflect the phone call, and ICS took no further action to collect on Ms. Dorsey's alleged debt. (*See id*. at 51–53; doc. 47-2 at 7 ¶ 27). ICS stopped "making active efforts to collect" Ms. Dorsey's unpaid balance as of February 2022. (Doc. 47-4 at 19).

In May 2022, ICS received a second notification from Trans Union that Ms. Dorsey disputed ICS's credit reporting. (Doc. 47-2 at 7 ¶ 28; *see id*. at 12; doc. 47-4 at 22). In that dispute, Ms. Dorsey claimed that (1) the debt was not hers and (2) if it was her debt, ICS inaccurately reported the balance amount. (Doc. 47-4 at 22). Consistent with the previously described policy, ICS verified (1) Ms. Dorsey's

name, address, Social Security number, and other personal identifying information and (2) that the debt amount matched the amount AT&T had reported to ICS. (*See id*. at 22, 24, 26; doc. 47-2 at 8 ¶¶ 32–34). And again, ICS concluded that its credit reporting was accurate. (Doc. 47-2 at 8 ¶¶ 32–34; *see also* doc. 47-4 at 22, 24, 26). ICS therefore verified to Trans Union that the credit reporting information was correct. (Doc. 47-4 at 8 ¶ 34).

At the end of 2022, Ms. Dorsey's unpaid AT&T balance was removed from her credit report. (*See* doc. 47-1 at 16). Before that time, Ms. Dorsey had applied for multiple credit cards, but the companies denied her applications because she had a debt on her credit report and the debt had impacted her overall credit score. (*See id*. at 16; *see also id*. at 12–13). After the debt was removed from her credit report, she was able to obtain multiple credit cards. (*Id*. at 16). Ms. Dorsey testified that her experience caused her emotional distress and impacted her physical wellbeing. (*See* doc. 47-1 at 16).

## II.    DISCUSSION

ICS moves for summary judgment as to all claims against it. (Doc. 38). Summary judgment is appropriate when a movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court considers Ms. Dorsey's claims sequentially.

1.  The FCRA Claim (Count Two)

In Count Two, Ms. Dorsey alleges that ICS, as a furnisher of consumer information to credit reporting agencies, did not conduct a reasonable investigation into her disputes as required by the FCRA. (*See* doc. 25 ¶¶ 37–41; *accord* doc. 49 at 10–19).

The FCRA requires furnishers of information to "conduct an investigation" with respect to disputed information and to "report the results of the investigation to the consumer reporting agency." 15 U.S.C. § 1681s-2(b)(A)–(C). The investigation can result in three types of findings: (1) verification that the information is accurate; (2) determination that the information is wrong or incomplete; or (3) determination that the information cannot be verified. *See id.* § 1681s-2(b)(1)(D)–(E); *Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212, 1218 (11th Cir. 2023). If a furnisher's investigation yields the second or third findings, "the furnisher must modify or delete the information." *Milgram*, 72 F.4th at 1218 (citing 15 U.S.C. § 1681s-2(b)(1)(E)).

The Eleventh Circuit has held that, to prevail on a claim under § 1681s-2(b), a plaintiff must prove at least the following two elements: (1) that the furnisher provided "inaccurate or incomplete information" to a credit reporting agency and (2) the investigation the furnisher conducted was unreasonable because there were "facts the furnisher could have uncovered that establish that the reported information was, in fact, inaccurate or incomplete." *Milgram*, 72 F.4th at 1218 (quotation marks

omitted). ICS contends that (1) it did not provide inaccurate information because AT&T never admitted she did not owe the debt, (2) its investigation was reasonable because Ms. Dorsey's second and third disputes were duplicative of her first dispute, and (3) it did not provide inaccurate information because Ms. Dorsey's dispute was based on a "legal dispute" instead of a "factual inaccuracy." (Doc. 48 at 18–29). The court examines each argument in turn.

ICS first contends that its investigation would not have changed anything because AT&T "maintained that [Ms. Dorsey] owed the debt at issue." (Doc. 48 at 26). Although Ms. Dorsey testified that one AT&T agent told her she owed the balance despite never receiving the services, multiple other agents told her that the bills were a mistake. (Doc. 47-1 at 6–7, 42; *see also* doc. 47-4 at 26). Moreover, taken in the light most favorable to Ms. Dorsey, the evidence indicates that ICS never asked AT&T whether the debt was valid, instead confirming only that Ms. Dorsey's identity was correct and then relying on AT&T agreement to refer to ICS only debts that were "validly due and owing." (Doc. 47-4 at 14; *see also id*. at 15–16, 18, 26). On this record, the court cannot find, as a matter of law, that if ICS had investigated, AT&T would have continued to maintain that Ms. Dorsey owed the debt.

Turning to ICS"s second argument, "[w]hat constitutes a reasonable investigation varies based on the circumstances," and the Eleventh Circuit has

identified a few relevant factors: (1) "whether the furnisher is an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line buyer"; (2) "what information the furnisher has available to it and what steps it takes to gather more information"; and (3) if the furnisher's investigation verifies the accuracy of its own reporting, "whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Milgram*, 72 F.4th at 1218 (quotation marks omitted). "This is a factual question, and it will normally be reserved for trial." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016).

ICS's only argument about the reasonableness of its investigation is that because Ms. Dorsey's first dispute is time-barred and her second and third disputes were identical to the first dispute, it did not need to conduct any further investigation into the second and third disputes. (Doc. 48 at 18–21). This argument stems from the Eleventh Circuit's *Milgram* decision, in which the Eleventh Circuit held that each time a furnisher fails to conduct a reasonable investigation constitutes a new violation under the FCRA, triggering a new statute of limitations period. 72 F.4th at 1219. The Eleventh Circuit dismissed the furnisher's concern that the ruling meant consumers could "continually reset the statute of limitations by filing new disputes," *id.* at 1219, because "courts look at each dispute in context, so in the case of a repeated dispute with no new material information, perhaps only minimal (or no)

reinvestigation might be 'reasonable'" and because data showed "consumers often needed to file multiple disputes to resolve an issue," *id.* at 1220.

As an initial matter, the *Milgram* court's explanation for why it found the furnisher's policy arguments about the statute of limitations unpersuasive is dicta. *See United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) ("[R]egardless of what [the] court says in its opinion, the decision can hold nothing beyond the facts of that case."). But even if that reasoning were a holding, the *Milgram* court did not hold that a furnisher has no duty to conduct a reasonable investigation of a duplicative dispute. The court explicitly stated that minimal investigation *might* be reasonable because the reasonableness of the investigation is evaluated in context. *Milgram*, 72 F.4th at 1220. And the sentence immediately following points out that data shows that repeated disputes are often necessary to resolve a consumer's issue, *id.*, cutting against the argument that a repeated dispute somehow lessens a furnisher's duty to conduct a reasonable investigation. Accordingly, the court rejects ICS's argument that because Ms. Dorsey's second and third disputes were duplicative of her first dispute, its investigations were necessarily reasonable.

ICS's third argument is that the information it provided was accurate because Ms. Dorsey's dispute was based on a legal question instead of a factual inaccuracy. (Doc. 48 at 21–25). The only authorities ICS offers in support of its argument are unpublished decisions by the Eleventh Circuit and district courts. (*See* doc. 48 at 21–

25). But after the parties briefed ICS's motion, the Eleventh Circuit issued its published decision in *Holden*, No. 22-11014, 2024 WL 1759143.

The *Holden* court "decline[d] to impose a bright-line rule that only purely factual or transcription errors are actionable under the FCRA." 2024 WL 1759143, at *7 (quotation marks omitted). Instead, the court held that to determine "whether a claimed inaccuracy is potentially actionable under § 1682, a court must determine . . . whether the information in dispute is objectively and readily verifiable." *Id.* (quotation marks omitted; alterations accepted). Because the Eleventh Circuit issued its *Holden* opinion after the parties briefed ICS's motion, the parties could not have briefed "whether the information in dispute is objectively and readily verifiable." *See id.* (quotation marks omitted). So the court **WILL RESERVE RULING** on this aspect of ICS's motion.

The court **DIRECTS** the parties to provide supplemental briefing as follows: ICS's brief is due on or before **May 15, 2024** and is limited to **TEN (10) PAGES**; Ms. Dorsey's brief is due on or before **May 29, 2024** and is likewise limited to **TEN (10) PAGES**. Each brief shall contain: (1) a statement of disputed and undisputed facts limited to the issue of "whether the information in dispute" *i.e.*, whether Ms. Dorsey owed money to AT&T, "is objectively and readily verifiable," *id.* (quotation marks omitted), and (2) a discussion of the Eleventh Circuit's decision in *Holden*, No. 22-11014, 2024 WL 1759143, and other relevant legal authorities. The

parties **SHALL NOT** use this opportunity to expand on arguments the court has already rejected. Except as modified by this court's order, the parties' briefs should comply with Appendix II of the court's initial order.

### 2. The FDCPA Claim (Count Three)

In Count Three, Ms. Dorsey alleges that ICS's conduct violated various provisions of the FDCPA: 15 U.S.C. §§ 1692d (prohibiting debt collectors from engaging in harassing, oppressive, or abusive conduct in connection with the collection of a debt) and 1692e (prohibiting debt collectors from using false, deceptive, or misleading representations or means in connection with the collection of a debt). (Doc. 25 ¶ 45). ICS moves for summary judgment on the claims Ms. Dorsey brought and one claim that she did not. (Doc. 48 at 29–39). Specifically, ICS contends that one of Ms. Dorsey's claims is that it violated the FDCPA because one of its employees provided false information to Ms. Dorsey. (*Id*. at 38–39). But Ms. Dorsey concedes that she has not asserted a claim based on the false statement made by one of ICS's representatives. (*See* doc. 49 at 25) (conceding that such a claim is barred by the applicable statute of limitations). Accordingly, the court **WILL DENY** ICS's motion for summary judgment on that claim **AS MOOT**.

Ms. Dorsey's amended complaint states that ICS violated the FDCPA by attempting to collect a debt that Ms. Dorsey did not owe and by verifying the existence of the debt to Trans Union. (Doc. 25 ¶ 43). In her briefing, she also points

to the allegations in the complaint that ICS reported the debt to Trans Union and called her after she disputed the debt. (Doc. 41 at 23; *see also* doc. 25 ¶¶ 15–18). Accordingly, the court construes the amended complaint to assert that ICS violated the FDCPA by: (1) attempting to collect a debt Ms. Dorsey did not owe; (2) calling her to attempt debt collection after she disputed the debt; and (3) reporting and verifying the debt to Trans Union.

Regarding the first two aspects of Ms. Dorsey's FDCPA claim, ICS invokes the bona fide error defense. (*See* doc. 48 at 29–36). Regarding the remaining aspect of Ms. Dorsey's FDCPA claim, ICS contends that it cannot be held liable because the FCRA mandated its communications with Trans Union. (*Id*. at 36–38). The court will examine each argument in turn.

### a.  The Bona Fide Error Defense

"The FDCPA typically subjects debt collectors to liability even when violations are not knowing or intentional." *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). But this general rule has a limited exception, known as the bona fide error defense. *See id*. (citing 15 U.S.C. § 1692k(c)). To obtain this defense, the debt collector bears the "burden of showing that its FDCPA violation (1) was not intentional; (2) was a bona fide error; and (3) occurred despite the maintenance of procedures reasonably adapted to avoid any such error." *Owen*, 629 F.3d at 1271 (quotation marks omitted).

ICS's arguments focus on the third element of the bona fide error defense. (*See* doc. 48 at 30). This inquiry proceeds in two steps. *See Owen*, 629 F.3d at 1273–74. "The first step is whether the debt collector maintained—i.e., actually employed or implemented—procedures to avoid errors." *Id*. at 1274 (quotation marks omitted). And "[t]he second step is whether the procedures were reasonably adapted to avoid the specific error at issue." *Id*. (quotation marks omitted).

These are the procedures that ICS contends it implemented: (1) ICS has a "policy to only collect debts that are due and owing" as evidenced by its contract with AT&T and (2) ICS "sends letters that comply with the FDCPA and provides account-specific information to educate consumers regarding the debt." (Doc. 48 at 30–31). The court is satisfied that ICS "has met the low threshold required by the first step." *Owen*, 629 F.3d at 1274. So, the court proceeds to the second step: whether these procedures "were reasonably adapted to avoid" the violations Ms. Dorsey has alleged: (1) ICS attempted to collect a debt she did not owe and (2) ICS's representatives called her to attempt debt collection after she disputed the debt. (Doc. 25 ¶¶ 15–18, 43; doc. 41 at 23).

ICS emphasizes that before it attempted collection efforts, it had no way to know that Ms. Dorsey's debt was disputed. (*See* doc. 48 at 34). According to ICS, the only procedure it *could* have employed is the procedure it already employs—AT&T's contractual obligation "to refer only valid debts for collection." (*Id*.).

Ms. Dorsey does not engage with this argument and instead emphasizes her view that ICS unreasonably relied on AT&T *after* she disputed the debt to ICS. (*See*, *e.g.*, doc. 49 at 22–23). The court is satisfied that AT&T's contractual obligation to refer only valid debts to ICS is a procedure reasonably adapted to avoid attempts to collect a debt the debtor does not owe. Accordingly, the court **WILL GRANT** ICS's motion and **WILL ENTER SUMMARY JUDGMENT** in ICS's favor as to the first aspect of Ms. Dorsey's claim.

But the court is unpersuaded that this procedure is sufficient for the second aspect of Ms. Dorsey's claim, which focuses on ICS's collection efforts after Ms. Dorsey notified ICS that she disputed owing AT&T money. (*See* doc. 25 ¶¶ 15–18, 43; doc. 41 at 23). Controlling precedent disfavors efforts to "blindly rely[ ] on creditors" via "form contract[s]." *Owen*, 629 F.3d at 1275. And although "the FDCPA does not require debt collectors to independently investigate and verify the validity of a debt to qualify for the bona fide error defense," a debt collector cannot qualify for the bona fide error defense by "delegating it[s] [obligations under the FDCPA] entirely to creditors, such as [AT&T], whose actions are not even regulated by the FDCPA." *Id*. at 1277. The court therefore is unpersuaded that ICS's contract with AT&T is sufficient under these circumstances to qualify for the bona fide defense.

ICS also emphasizes that it sent letters to Ms. Dorsey "that comply with the FDCPA and provide[d] account-specific information to educate [her] regarding the debt." (Doc. 48 at 30–31). But the FDCPA mandates these types of communications. *See* 15 U.S.C. § 1692g(a). "If debt collectors could meet their bona fide error defense burden by fulfilling their other statutory duties, the third element of § 1692k(c) would be mere surplusage." *Owen*, 629 F.3d at 1275. So the court is unpersuaded that this procedure, *i.e.*, complying with the FDCPA, is a procedure reasonably adapted to avoid attempts to collect a debt after receiving notice that the debt is disputed.

ICS highlights that it did not receive written notice of Ms. Dorsey's dispute. (*See* doc. 48 at 33). And on reply, ICS urges that the absence of a written dispute entitled it to continue collection efforts. (*See* doc. 52 at 10). As an initial matter, whether a debtor can *require* a dispute to be in writing for that dispute to be effective is an unanswered question in this Circuit. *See Baez v. Wagner & Hunt, P.A.*, 442 F. Supp. 2d 1273, 1276 (S.D. Fla. 2006) ("Whether a . . . letter that requires a consumer to dispute a debt in writing violates the FDCPA is a question of first impression in this Circuit."). But every circuit court to address the issue has concluded that an oral dispute is as effective as a written dispute. *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 589 (3d Cir. 2020) (en banc) (collecting cases).

Even if the court were persuaded that only written disputes were effective under the FDCPA, ICS has misconstrued Ms. Dorsey's claim. The provision of the FDCPA invoked by ICS is 15 U.S.C. § 1692g(c) (prohibiting collection efforts after notification that the debt is disputed). But Ms. Dorsey seeks relief for ICS's alleged violations of 15 U.S.C. §§ 1692d (prohibiting debt collectors from engaging in harassing, oppressive, or abusive conduct in connection with the collection of a debt) and 1692e (prohibiting debt collectors from using false, deceptive, or misleading representations or means in connection with the collection of a debt). (Doc. 25 ¶ 45). And compliance with one provision of the FDCPA does not immunize debt collectors from violations of other provisions of the FDCPA. *Owen*, 629 F.3d at 1275. The court therefore **WILL DENY** ICS's motion as to that aspect of Ms. Dorsey's FDCPA claim.

> b. *Whether Compliance with the FCRA is a Defense to Alleged Violations of the FDCPA*

The third aspect of Ms. Dorsey's FDCPA claim focuses on ICS's communications to Trans Union in which ICS reported and verified her debt despite knowing of Ms. Dorsey's dispute. (Doc. 25 ¶ 43). ICS's only argument with respect to this part of the claim is that it cannot be held liable because the FCRA mandated these communications. (*See* doc. 48 at 36–38).

But, contrary to ICS's contention, the FCRA did not mandate that ICS *verify* the debt: instead, the FCRA requires that, after investigating a dispute, the furnisher

verify that the information is accurate *or* modify or delete the information if it is inaccurate or cannot be verified. 15 U.S.C. § 1681s-2(b)(1)(D)–(E); *Milgram*, 72 F.4th at 1218. The court has reserved ruling on whether ICS provided Trans Union with inaccurate information. *See supra* at 13–14. But if a reasonable jury could make that finding, then ICS's communication is not protected as a matter of law because the FCRA did not require ICS to verify the debt. *See* 15 U.S.C. § 1681s-2(b)(1)(D)–(E); *Milgram*, 72 F.4th at 1218. Accordingly, the court **WILL RESERVE RULING** on the remaining aspect of Ms. Dorsey's FDCPA claim until the court has resolved Ms. Dorsey's FCRA claim.

## III.   CONCLUSION

The court **WILL GRANT IN PART**, **DENY IN PART,** and **RESERVE RULING IN PART**.

Regarding Ms. Dorsey's FCRA claim, the court rejects many of ICS's arguments. The court however **WILL RESERVE RULING** on ICS's remaining argument in which ICS asserts the information ICS provided Trans Union was accurate because Ms. Dorsey's dispute was based on a legal question instead of a factual inaccuracy. (*See*, *e.g.*, doc. 48 at 21–25). In the light of the Eleventh Circuit's recent opinion, *Holden*, No. 22-11014, 2024 WL 1759143, the court **DIRECTS** the parties to provide supplemental briefing on this issue.

Regarding Ms. Dorsey's FDCPA claim, the court **WILL GRANT** ICS's motion and **WILL ENTER SUMMARY JUDGMENT** in ICS's favor to the extent Ms. Dorsey alleges that ICS's efforts to collect the debt before her first dispute violated the FDCPA. The court **WILL DENY** ICS's motion on the aspect of this claim that alleges that ICS violated the FDCPA when it called Ms. Dorsey to attempt debt collection after receiving notice that she disputed the debt. The court **WILL RESERVE RULING** on the aspect of Ms. Dorsey's claim that alleges ICS violated the FDCPA when it reported and verified the debt to Trans Union after she disputed the debt because that aspect of her claim implicates ICS's argument regarding the FCRA.

The court will enter a partial summary judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this May 1, 2024.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE