## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHARON DORSEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  2:22-cv-1489-ACA** |
| | ) | |
| **TRANS UNION, LLC,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Sharon Dorsey filed a complaint asserting, among other claims, that Defendant IC System, Inc. ("ICS") violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b), ("Count Two") and the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. §§ 1692d, 1692e ("Count Three"), in its investigation and reporting of a debt AT&T alleged she owed. (Doc. 25 ¶¶ 37–44). The court previously ruled on many aspects of the motion for summary judgment filed by ICS. (Docs. 57, 58). The court reserved ruling on the limited issue of "whether the information in dispute *i.e.*, whether Ms. Dorsey owed money to AT&T, is objectively and readily verifiable" in the light of the Eleventh Circuit's intervening decision in *Holden v. Holiday Inn Club Vacations Inc.*, 98 F.4th 1359, 1369 (11th Cir. 2024). (Doc. 57 at 13–14, 20) (quotation marks omitted).

Because Ms. Dorsey has identified alleged inaccuracies in ICS's credit

reporting that were objectively and readily verifiable, the court **DENIES** the remaining part of ICS's motion as to Ms. Dorsey's FCRA claim. As a result, ICS's communication is not protected as a matter of law (*see* doc. 57 at 19–20), so the court **DENIES** the remaining part of ICS's motion as to Ms. Dorsey's FDCPA claim as well.

## I.    BACKGROUND

Because this case is before the court on supplemental briefing, the court includes only the facts that are relevant to the matters upon which the court reserved ruling. Accordingly, these are the facts construed in the light most favorable to Ms. Dorsey:

In 2018, Ms. Dorsey opened an account with AT&T, but she subsequently learned that the services she sought were unavailable to her. (Doc. 47-1 at 5; doc. 47-2 at 50). Although Ms. Dorsey did not receive those services from AT&T, AT&T billed her monthly for them. (Doc. 47-1 at 5–6; *see also* doc. 47-4 at 14, 16). When Ms. Dorsey received these monthly bills, she called AT&T to remind them that she did not owe them for the services she did not receive. (*Id*.). The first three times Ms. Dorsey called AT&T, the representatives she spoke with apologized and indicated that AT&T inadvertently sent the bill to her. (*Id*.).

But the fourth time, the AT&T's representative's response was different. (*Id.* at 7–8). The AT&T representative told Ms. Dorsey that she had an outstanding

balance on her bill and she would have to pay that amount "or [her account] would be turned over to a collection company." (Doc. 47-1 at 7; *see also id*. at 42). Ms. Dorsey did not pay the outstanding balance. (*Id*. at 7). And AT&T referred Ms. Dorsey's account to ICS for debt collection services. (*See* doc. 47-2 at 23; *see also* doc. 47-4 at 3).

As part of AT&T and ICS's contract, AT&T refers debts to ICS that are "validly due and owing." (Doc. 47-4 at 14, 28). When ICS communicates a consumer dispute to AT&T, AT&T remains obligated "to verify the validity of the debt and to keep [ICS] updated" on the debt's validity. (*Id*. at 28; *see also id*. at 26). And ICS reports debts to credit reporting agencies. (*See*, *e.g.*, doc. 47-2 at 5 ¶ 18).

Ms. Dorsey spoke to ICS's representatives by phone on two occasions. (*See id*. at 49–61; doc. 47-3 at 21–32). Each time, Ms. Dorsey notified the representative that she disputed owing the debt. (Doc. 47-2 at 51–53; doc. 47-3 at 27–29). And after each call, ICS updated its internal records to reflect that Ms. Dorsey disputed the debt. (Doc. 47-3 at 4 ¶ 13; *see* doc. 47-2 at 51–53). ICS's system also automatically communicated the dispute to various credit reporting agencies. (Doc. 47-2 ¶¶ 20, 39). But because Ms. Dorsey's dispute was verbal and not in writing, ICS did not require a response from AT&T about the dispute. (*See* doc. 39-2 at 15) ("Answer Not Required"); (doc. 47-4 at 14–15). Instead, ICS assumed, based on AT&T

contract to report only "validly due and owing" debts, that Ms. Dorsey did owe the debt. (Doc. 47-4 at 14).

Ms. Dorsey also disputed ICS's credit reporting of the debt to various credit bureaus, which communicated that dispute to ICS. (Doc. 47-3 at 5 ¶ 15; doc. 47-2 at 7 ¶ 28; *see also* doc. 47-2 at 12, 14; doc. 47-4 at 16, 22). When a consumer disputes ICS's reporting to a credit reporting agency, ICS's policy is to "recommunicate" the dispute to the original creditor and see if the creditor updates the file with a balance adjustment or payment information. (Doc. 47-4 at 18; *see also id*. at 22). Consistent with this policy, ICS sent Ms. Dorsey's disputes to AT&T. (*See id*. at 14–16, 18, 26). Because AT&T did not recall the debt, ICS determined that its credit reporting was accurate and that Ms. Dorsey had an outstanding balance with AT&T. (Doc. 47-3 ¶¶ 15–16; doc. 47-2 at 8 ¶¶ 32–34; *see also* doc. 47-4 at 22, 24, 26). ICS therefore verified to the credit reporting agency that its reporting was accurate. (Doc. 47-2 at 6 ¶ 24; doc. 47-4 at 8 ¶ 34).

## II.   DISCUSSION

ICS moved for summary judgment. (Doc. 38). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The court reserved ruling on Count Two and on the aspect of Count Three that alleges ICS violated the FDCPA when it reported and verified the debt to a credit reporting agency after she disputed it. (Doc. 57 at 13–14, 20–21). ICS provided supplemental briefing for both claims. (Doc. 59). The court will first explain how ICS has exceeded the scope of the court's supplemental briefing order. The court will then consider the merits of ICS's arguments that are appropriately before the court.

    1.  The Court's Supplemental Briefing Order (Doc. 57)

On summary judgment, ICS argued that the information it provided to credit reporting agencies was accurate because Ms. Dorsey's dispute was based on a legal dispute instead of a factual inaccuracy. (Doc. 48 at 21–25). The only authorities ICS offered in support of its argument were unpublished decisions by the Eleventh Circuit and district courts. (*Id.*). After the parties briefed ICS's motion, the Eleventh Circuit issued its published decision in *Holden*, 98 F.4th 1359, which clarified the standard for actionable inaccuracy under the FCRA. So the court reserved ruling on the aspect of ICS's motion that implicated this issue and instructed the parties to provide supplemental briefing as follows:

> Each brief shall contain: (1) a statement of disputed and undisputed facts limited to the issue of whether the information in dispute *i.e.*, whether Ms. Dorsey owed money to AT&T, is objectively and readily verifiable, and (2) a discussion of the Eleventh Circuit's decision in *Holden* and other relevant legal authorities. The parties shall not use this opportunity to expand on arguments the court has already rejected.

(Doc. 57 at 13–14) (cleaned up).

In its supplemental brief, ICS now argues that summary judgment is appropriate because the evidence Ms. Dorsey relied on during initial briefing (statements made by AT&T employees and evidence that AT&T does not provide service at Ms. Dorsey's home address) is hearsay or otherwise inadmissible. (Doc. 59 at 6–7). But ICS did not make this argument in its earlier briefing. (*See* docs. 48, 52). At best, a footnote in its initial brief generally alluded to the inadmissibility of some of Ms. Dorsey's evidence about where AT&T services were available. (Doc. 48 at 28 n.2).

As an initial matter, the court does "not consider substantive arguments made in footnotes." (Doc. 12 at 14). But even if ICS had not made this challenge in a footnote, the court would not have considered it because it was inadequately briefed. A party must adequately brief an argument by citing authority, referring to the facts of the party's case, and providing a "meaningful explanation" for how the legal authority applies to the party's claim. *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 899 (11th Cir. 2022). "[P]assing references" simply do not suffice. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). And when a party fails to adequately brief an argument, that argument is forfeited. *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc).

ICS asserted only that Ms. Dorsey's evidence about where AT&T services were available was "irrelevant and inadmissible." (Doc. 48 at 28 n.2). But ICS did not cite either the evidence or any authority for this position. (*See id*.); *see Harner*, 38 F.4th at 899. And ICS provided no explanation—much less a "meaningful" one— for why this evidence was inadmissible. (*See* doc. 48 at 28 n.2); *see Harner*, 38 F.4th at 899. Accordingly, ICS forfeited challenging the admissibility of Ms. Dorsey's evidence on summary judgment. *See Campbell*, 26 F.4th at 873; *see also Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (observing that in the absence of an objection, inadmissible evidence "could and, if material, should be factored into a summary judgment decision").

### 2.  ICS's Arguments

The parties devote much of their respective briefs to their own understanding of the *Holden* decision. (Doc. 59 at 3–4; doc. 60 at 3–5). So the court starts with *Holden* before turning to the parties' arguments.

#### a.  *Holden v. Holiday Inn Club Vacations, Inc.*, 98 F.4th 1359 (11th Cir. 2024)

In *Holden*, two consumers entered into purchase and finance agreements for timeshares with Holiday, a timeshare company. 98 F.4th at 1363. The agreements required monthly payments and contained a purchaser's default provision which provided that, in the event of a consumer's default, the agreement terminated and the parties would "be relieved" of any remaining obligations. *Id.* (quotation marks

omitted). Each consumer defaulted on their purchase agreement obligations. *Id.* at 1364–65. Each consumer invoked the default provision, contending that the purchase agreements were terminated and that they were relieved of further payment obligations. *Id.* Holiday disagreed with each consumer's assessment and reported the delinquent accounts to a credit reporting agency. *Holden*, 98 F.4th at 1364–65. The consumers disputed the debts to the credit reporting agency, invoking the default provision of the parties' contract. *Id*. The credit reporting agency relayed the dispute to Holiday, and Holiday verified the accuracy of its credit reporting. *Id*.

The consumers then filed suit, alleging that Holiday violated the FCRA by reporting inaccurate information, failing to conduct a reasonable investigation, and failing to correct inaccuracies. *Id.* The Eleventh Circuit held that "a claimed inaccuracy is potentially actionable under" the FCRA when "the information in dispute is objectively and readily verifiable." *Holden*, 98 F.4th at 1369 (quotation marks omitted). The consumers' claims failed to meet that standard because their contractual dispute lacked "a straightforward answer": Florida state courts had reached conflicting conclusions about whether the default provision at issue excused a consumer's obligation to keep paying. *Id*. at 1367–68. And faced with these conflicting conclusions, the alleged inaccuracy of Holiday's decision that the debts remained outstanding was not objectively and readily verifiable. *Id*. at 1368.

Ultimately, the FCRA requires entities that furnish debt information to credit reporting agencies "to investigate, and even to highlight or resolve, questions of legal significance" because these entities "are qualified and obligated to assess issues such as whether debts are actually due and/or are collectible." *Holden*, 98 F.4th at 1368. (quotation marks and emphasis omitted). So "if a legal question is sufficiently settled so that the import on a particular debt is readily and objectively verifiable, the FCRA sometimes requires that the implications of that decision be reflected in credit reports." *Id.* (quotation marks omitted).

> b.  *Whether Ms. Dorsey's dispute was readily and objectively verifiable*

The court reserved ruling on all of Count Two, which is Ms. Dorsey's FCRA claim, and the part of Count Three in which Ms. Dorsey asserted that ICS violated the FDCPA when it reported and verified her debt to a credit reporting agency despite knowing Ms. Dorsey disputed that debt. (*See* doc. 57 at 13–14, 19–20). ICS argues that Ms. Dorsey's claims are not actionable because the AT&T representatives gave Ms. Dorsey mixed messages regarding whether she owed the debt, which demonstrates that the debt was not objectively verifiable. (Doc. 59 at 6). The court rejects this argument.

The dispositive question is whether the answer to Ms. Dorsey's contractual dispute is "objectively and readily verifiable." *Holden*, 98 F.4th at 1369 (quotation marks omitted). Unlike in *Holden*, where state courts had interpreted provisions of

a contract in conflicting ways, *see* 98 F.4th at 1368, the legal standard applicable to this contractual dispute is straightforward. No party disputes that if Ms. Dorsey received services from AT&T, she owed the debt, and if AT&T failed to provide those services, she did not. Ms. Dorsey testified that she did not receive the services from AT&T. (Doc. 47-1 at 5). Taking the facts in the light most favorable to Ms. Dorsey, the answer to the contractual dispute is "objectively and readily verifiable," *Holden*, 98 F.4th at 1369 (quotation marks omitted), in Ms. Dorsey's favor.

The court is mindful that ICS is not the original creditor for Ms. Dorsey's debt. (*See* doc. 59 at 9–10); *see also Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212, 1218 (11th Cir. 2023) ("[W]hether the furnisher is an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line buyer can affect how [federal courts] evaluate the reasonableness of its investigation.") (quotation marks omitted). Perhaps the question would be closer if ICS *had* contacted AT&T to investigate Ms. Dorsey's dispute. *See id*. But here, ICS relied exclusively on AT&T's contractual obligation to refer debts that were "validly due and owing" and took no further steps. (*See* doc. 47-4 at 14–16). Although ICS "isn't the FBI" (*id*. at 16), ICS is both "qualified and obligated to assess issues such as whether debts are actually due and/or are collectible" when the question is straightforward, *Holden*, 98 F.4th at 1368 (quotation marks omitted).

Accordingly, with the benefit of supplemental briefing, the court **DENIES** the remaining part of ICS's motion.

## III.   CONCLUSION

The court **DENIES** the remaining aspects of ICS's motion for summary judgment. (Doc. 38; *see also* docs. 57, 58). This case will proceed to trial as to Count Two and Count Three to the extent Ms. Dorsey alleges that ICS violated the FDCPA when: (1) it called Ms. Dorsey to attempt debt collection after receiving notice that she disputed the debt and (2) it reported and verified the debt to a credit reporting agency after she disputed the debt.

**DONE** and **ORDERED** this July 9, 2024.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE